734 A.2d 1196

JAMES DALE, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. BOY SCOUTS OF AMERICA AND MONMOUTH COUNCIL, BOY SCOUTS OF AMERICA, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS.

Argued January 5, 1999—Decided August 4, 1999.

564

568

*George A. Davidson,* a member of the New York bar, argued the cause for defendants-appellants and cross-respondents (*Cerrato, Dawes, Collins, Saker & Brown;* attorneys; *Mr. Davidson, Sanford D. Brown* and *Carla A. Kerr,* a member of the New York bar, on the briefs).

*Evan Wolfson,* a member of the New York bar, argued the cause for plaintiff-respondent and cross-appellant (*Lewis H. Robertson,* attorney; *Mr. Wolfson, Mr. Robertson* and *Thomas J. Moloney,* a member of the New York bar, on the briefs).

*David R. Rocah,* submitted a letter in lieu of brief on behalf of *amici curiae* American Civil Liberties Union of New Jersey and American Civil Liberties Union (*Lenora M. Lapidus,* Legal Director, attorney).

*William S. Singer,* submitted a letter in lieu of brief on behalf of *amici curiae* American Public Health Association and Parents, Families and Friends of Lesbians and Gays (*Singer & Fedun,* attorneys).

*Robert E. Rochford,* submitted a brief on behalf of *amici curiae* National Catholic Committee on Scouting, The Church of Jesus Christ of Latter–Day Saints, General Commission on United Methodist Men, The United Methodist Church and The Lutheran Church–Missouri Synod (*Winnie Banta Rizzi Hetherington & Basralian,* attorneys).

*David H. Dugan, III,* submitted a brief on behalf of *amici curiae* The Claremont Institute for the Study of Statesmanship and Political Philosophy and United States Congressmen Charles T. Canady, Christopher B. Cannon, Tom A. Coburn, M.D., John E. Peterson, John Shadegg and Mark Souder.

*Kathleen A. Mazzouccolo,* submitted a letter in lieu of brief on behalf of *amici curiae* Diocesan Council of the Episcopal Diocese

of Newark, Friends Committee on National Legislation, Jewish Reconstructionist Federation, Union of American Hebrew Congregations and Unitarian Universalist Association.

*Bray B. Barnes,* submitted a brief on behalf of *amicus curiae* The Individual Rights Foundation *(Warshaw & Barnes,* attorneys).

*Theodore R. Bohn,* submitted a letter in lieu of brief on behalf of *amicus curiae* New Jersey Lesbian and Gay Law Association.

*James P.A. Cavanaugh,* submitted a letter in lieu of brief on behalf of *amici curiae* National Association of Social Workers and New Jersey Chapter of the National Association of Social Workers.

*Michael Patrick Carroll,* submitted a brief on behalf of *amicus curiae* Southeastern Legal Foundation *(Mr. Carroll,* attorney; *Valle Simms Dutcher,* a member of the Georgia Bar, on the brief).

*James J. Cerbone,* submitted a brief on behalf of *amici curiae* United States Congressmen, Honorable Robert Aderholt (Ala.), Ernest Istook (Okla.), Asa Hutchinson (Ark.) and Charles "Chip" Pickering (Miss.)*(Cerbone & Lombardo,* attorneys).

The opinion of the Court was delivered by

PORITZ, C.J.

In 1991, the New Jersey Legislature amended the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, to include protections based on "affectional or sexual orientation." This case requires us to decide whether that law prohibits Boy Scouts of America (BSA) from expelling a member solely because he is an avowed homosexual.

Defendants BSA and Monmouth Council (collectively Boy Scouts) seek review of a decision of the Appellate Division holding that: (1) Boy Scouts is a place of public accommodation as defined by the LAD; (2) Boy Scouts' expulsion of plaintiff James Dale, an assistant scoutmaster, based solely on the club's policy of exclud-

ing avowed homosexuals from membership is prohibited by the LAD; and (3) the LAD prohibition does not violate Boy Scouts' First Amendment rights. Plaintiff, James Dale, seeks certification on his common law claim, dismissed by the Appellate Division. We granted both parties' petitions, 156 *N.J.* 381, 718 *A.*2d 1210, 156 *N.J.* 382, 718 *A.*2d 1210 (1998), and now affirm.

# I

## *FACTS*

### A. *Boy Scouts of America*

#### 1. *Organizational Structure and Programs* [1]

BSA, a federally chartered corporation, 36 *U.S.C.A.* § 30901, operates four scout membership programs: Cub Scouts (for boys eight to eleven-and-a-half), Boy Scouts (for boys and young men eleven to seventeen), Varsity Scouts (for young men fourteen to seventeen), and Explorers (for young men and women fourteen to twenty). In addition to these well-known membership programs, BSA publishes *Boys' Life, Exploring* and *Scouting* magazines, and offers an in-school scouting curriculum called Learning for Life that is taught in many schools throughout the country.

BSA membership is an American tradition. Since the program's inception in 1910 through the beginning of this decade, over eighty-seven million youths and adults have joined BSA. As of December 1992, over four million youths and over one million adults were active BSA members. BSA's success in attracting members is at least partly attributable to its long-standing commitment to a diverse and "representative" membership, as well as its aggressive recruitment through national television, radio, and magazine campaigns. BSA also organizes local membership

---

[1] Although not always specifically designated in the text, our description of Boy Scouts is derived primarily from the BSA Charter, Bylaws, and Rules and Regulations; the *Boy Scout Handbook* (10th ed.1990); and the *Scoutmaster Handbook* (1990). These publications, taken together, provide a comprehensive view of the organization's structure, programs and missions.

drives, including "School Nights" conducted in cooperation with schools across the nation and held at school facilities.

This vast network of members is managed through a complex of national, regional and local organizations. The National Council is the highest BSA governing body. Its primary functions include "develop[ing] programs, set[ting] and maintain[ing] quality standards in training, leadership selection, uniform[s], registration records, literature development, and advancement requirements; and publish[ing] *Boy's Life* and *Scouting* magazines." BSA membership programs are also governed by regional committees that are further divided into area committees. Within each area, BSA accepts applications for the creation of local councils. Defendant, Monmouth Council, is one of sixteen local councils in New Jersey, and one of over four hundred local councils nationwide.

Each local council is made up of districts that are governed by district committees. BSA grants unit charters to individual sponsors in the districts consisting of "organizations and groups of citizens" that establish and "maintain units ... and ... issue certificates of membership ... to the officers and members thereof." Unit charters allow the "organization to use the Scouting program under its own leadership to serve the youth and families for which it has concern, to help it accomplish its own objectives." Individual units are based on age groupings and designated as Cub Scout Packs, Boy Scout Troops, Varsity Scout Teams, and Explorer Posts. In 1991, Monmouth Council chartered approximately 215 units comprised of nearly 8500 youth members and over 2700 adult members.

When deciding whether to grant an individual unit charter, BSA investigates "the general objectives, purpose, character, intent, and programs of the prospective chartered organization or community group and its compatibility with the aims and purposes of the Boy Scouts of America." In respect of established groups, BSA also considers the group's "history, length of service, and general reputation." Generally, BSA prefers granting unit charters to sponsors that are "existing organizations," *i.e.*, established

religious, civic, or educational groups. In New Jersey, for example, public schools and school-affiliated groups sponsor close to 500 scouting units, comprising approximately one-fifth of the chartering organizations in the State. Other governmental entities, such as law enforcement agencies, fire departments, city governments, and the military, sponsor approximately 250 scouting units in New Jersey. Sponsor approvals "obligate the organization to provide adequate facilities, supervision, and leadership for at least one year[,] and to make an effort to provide youth members with the opportunity for a quality program experience as set forth in the official literature of the Boy Scouts of America."

A unit charter is renewed annually, "upon application, provided a review of past activities, personnel, and plans for the future shows a satisfactory effort to carry out the scouting program, as set forth in the official handbooks, and [demonstrates compliance] with the Rules and Regulations of the Boy Scouts of America." [2] Each chartered unit is supervised by a "unit committee, consisting of three or more qualified adults, 21 years of age or over, selected by the organization with which the unit is connected, or in the case of a community unit[,] of those who make application for the unit charter, one of whom [is] designated as chairman." In Monmouth Council, the units are run by approximately 3000 volunteer leaders and four paid scouting professionals. Of the 3000 volunteers, some 340 are assistant scoutmasters.

According to BSA's federal charter, BSA seeks "to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues." BSA's Mission Statement also describes BSA's purpose: "It is the mission of the Boy Scouts of America to serve others by helping to instill values in young

---

[2] Although a relatively small percentage of New Jersey unit charters are not renewed each year, we are unaware of applicants having been rejected because of their expressed views on any subject.

people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential." The Scout Oath and Scout Law set forth the guiding principles of BSA:

### *Scout Oath*

On my honor I will do my best
To do my duty to God and my country
and to obey the Scout Law;
To help other people at all times;
To keep myself physically strong, mentally awake, and morally straight.

### *Scout Law*

**A Scout is TRUSTWORTHY.** A Scout tells the truth. He keeps his promises. Honesty is a part of his code of conduct. People can always depend on him.

**A Scout is LOYAL.** A Scout is true to his family, friends, Scout leaders, school, nation, and world community.

**A Scout is HELPFUL.** A Scout is concerned about other people. He willingly volunteers to help others without expecting payment or reward.

**A Scout is FRIENDLY.** A Scout is a friend to all. He is a brother to other Scouts. He seeks to understand others. He respects those with ideas and customs that are different from his own.

**A Scout is COURTEOUS.** A Scout is polite to everyone regardless of age or position. He knows that good manners make it easier for people to get along together.

**A Scout is KIND.** A Scout understands there is strength in being gentle. He treats others as he wants to be treated. He does not harm or kill anything without reason.

**A Scout is OBEDIENT.** A Scout follows the rules of his family, school, and troop. He obeys the laws of his community and country. If he thinks these rules and laws are unfair, he tries to have them changed in an orderly manner rather than disobey them.

**A Scout is CHEERFUL.** A Scout looks for the bright side of life. He cheerfully does tasks that come his way. He tries to make others happy.

**A Scout is THRIFTY.** A Scout works to pay his way and to help others. He saves for the future. He protects and conserves natural resources. He carefully uses time and property.

**A Scout is BRAVE.** A Scout can face danger even if he is afraid. He has the courage to stand for what he thinks is right even if others laugh at him or threaten him.

**A Scout is CLEAN.** A Scout keeps his body and mind fit and clean. He goes around with those who believe in living by these same ideals. He helps keep his home and community clean.

**A Scout is REVERENT.** A Scout is reverent toward God. He is faithful in his religious duties. He respects the beliefs of others.

In its briefs below and to this Court, Boy Scouts claims that the language "morally straight" and "clean" in the Oath and Law, respectively, constitutes a rejection of homosexuality. The *Boy Scout Handbook, supra,* at 551, defines "morally straight" as follows:

To be a person of strong character, guide your life with honesty, purity, and justice. Respect and defend the rights of all people. Your relationships with others should be honest and open. Be clean in your speech and actions, and faithful in your religious beliefs. The values you follow as a Scout will help you become virtuous and self-reliant.

The *Boy Scout Handbook* also defines "clean":

A Scout is CLEAN. A Scout keeps his body and mind fit and clean. He chooses the company of those who live by these same ideals. He helps keep his home and community clean.

You never need to be ashamed of dirt that will wash off. . . .

There's another kind of dirt that won't come off by washing. It is the kind that shows up in foul language and harmful thoughts.

Swear words, profanity, and dirty stories are weapons that ridicule other people and hurt their feelings. The same is true of racial slurs and jokes making fun of ethnic groups or people with physical or mental limitations. A Scout knows there is no kindness or honor in such mean-spirited behavior. He avoids it in his own words and deeds. He defends those who are the targets of insults.

[*Id.* at 561.]

Although one of BSA's stated purposes is to encourage members' ethical development, BSA does not endorse any specific set of moral beliefs. Instead, "moral fitness" is deemed an individual choice:

Morality . . . concerns the "principles of right and wrong" in our behavior, and "what is sanctioned by *our* conscience or ethical judgment." . . .

In any consideration of moral fitness, a key word has to be "courage." A boy's courage to do what *his* head and *his* heart tell him is right. And the courage to refuse to do what *his* heart and *his* head say is wrong.

[*Scoutmaster Handbook, supra,* at 71 (emphasis added) (additional internal quotations omitted).]

BSA also does not espouse any one religion, explaining in the *Scoutmaster Handbook* that "[t]here is a close association between the Boy Scouts of America and virtually all religious bodies and denominations in the United States." *Id.* at 227. Consistent with

its nonsectarian nature, BSA Bylaws require "respect [for] the convictions of others in matters of custom and religion." Boy Scouts "encourages no particular affiliation, [and does not] assume[ ][the] functions of religious bodies," *ibid.;* indeed, in a training manual entitled *Scoutmaster Fundamentals* prepared "for Scoutmasters, Assistant Scoutmasters, Troop Committee members, and parents," BSA categorically states: "Religious instruction is the responsibility of the home and church."

A large and diverse group of religions that subscribe to many different and sometimes contradictory beliefs sponsor BSA units throughout the United States. Some of those sponsors have participated in this case as *amici curiae,* taking a variety of positions in respect of homosexuality, *i.e.,* that homosexuality is "immoral"; that "discrimination based upon sexual orientation" is to be "strongly condemn[ed]." BSA, however, encourages its leaders to refrain from talking about sexual topics. Although the *Boy Scout Handbook, supra,* at 528, contains a subchapter entitled "Sexual Responsibility" which states that "[f]or the followers of most religions, sex should take place only between married couples," sexual topics are not formally discussed during Boy Scout activities. Rather, BSA "believes that boys should learn about sex and family life from their parents, consistent with their spiritual beliefs."

### 2. *Boy Scout Troops*

In 1992, of the five million members of BSA, approximately one million youths and 420,000 adults were involved in the Boy Scout division. Those members belonged to over 44,000 Boy Scout troops throughout the country.

According to the *Boy Scout Handbook, id.* at 2, a boy may become a Boy Scout if he "has completed the fifth grade, or ... has earned the Arrow of Light Award, or [is at least] 11 years of age but not yet 18" and "[c]omplete[s] the Boy Scout joining requirements." The Boy Scout joining requirements call for the applicant to:

Submit a completed Boy Scout application and health history signed by [a] parent or guardian.

Repeat the Pledge of Allegiance.

Demonstrate the Scout salute, sign, and handclasp.

Show how to tie the square knot.

Understand and agree to live by the Scout Oath, the Scout Law, the Scout motto, the Scout slogan, and the Outdoor Code.

Describe the Scout badge.

With [a] parent or guardian, complete the exercises in the pamphlet *How to Protect Your Children from Child Abuse and Drug Abuse.*

Participate in a Scoutmaster conference.

[*Id.* at 4.]

Adult applicants are also subject to joining requirements. They must be recommended by the troop representative and approved by the local council, and they must subscribe to the Declaration of Religious Principle,[3] the Scout Oath and the Scout Law. Once an adult member is approved, that person is also qualified to be a leader. Boy Scouts explains that the terms "adult membership and adult leadership .... are interchangeable ... since adults ... have no other reason to join apart from leadership in service to boys."

## B. *James Dale*

James Dale first became a BSA member in 1978 when, at the age of eight, he joined Monmouth Council's Cub Scout Pack 142. He remained a Cub Scout until 1981, when he became a member of Boy Scout Troop 220, also in Monmouth Council. He joined Monmouth Council's Boy Scout Troop 128 in 1983, and Troop 73 in

---

[3] BSA's Declaration of Religious Principle states:

The Boy Scouts of America maintains that no member can grow into the best kind of citizen without recognizing an obligation to God.... No matter what the religious faith of the members may be, this fundamental need of good citizenship should be kept before them. The Boy Scouts of America, therefore, recognizes the religious element in the training of the member, but it is absolutely nonsectarian in its attitude toward that religious training. Its policy is that the home and the organization or group with which the member is connected shall give definite attention to religious life.

1985. Until his eighteenth birthday in 1988, he remained a youth member of Troop 73.

Dale was an exemplary scout. Over the ten years of his membership, he earned more than twenty-five merit badges. In 1983, he was admitted into Boy Scouts' Order of the Arrow, the organization's honor camping society, and achieved the status of Virgil Honor. The pinnacle of Dale's career as a youth member came in 1988, when BSA awarded him an Eagle Scout Badge, an honor achieved by only the top three percent of all scouts.

Dale's participation in Boy Scout leadership began at an early age. Throughout his years as a member, Dale was an assistant patrol leader, patrol leader, and bugler, and from 1985 to 1988, Dale served as a Junior Assistant Scoutmaster for Troop 73. He was also invited to speak at organized Boy Scout functions, such as the Joshua Huddy Distinguished Citizenship Award Dinner, and attended national events, including the National Boy Scout Jamboree. On March 21, 1989, Dale sought adult membership in Boy Scouts. Monmouth Council and BSA accepted and approved his application for the position of Assistant Scoutmaster of Troop 73 where he served for approximately sixteen months.

At about the same time that Dale applied for adult membership, he left home to attend Rutgers University. While at college, Dale first acknowledged to himself, and to his family and friends, that he was gay. Shortly thereafter, he became involved with, and eventually became the co-president of the Rutgers University Lesbian/Gay Alliance. Then, in July 1990, Dale attended a seminar that addressed the psychological and health needs of lesbian and gay teenagers. The *Star–Ledger* interviewed Dale and published an article on July 8, 1990 that discussed the seminar. The article included Dale's photograph and a caption identifying him as "co-president of the Rutgers University Lesbian/Gay Alliance." Kinga Borondy, *Seminar Addresses Needs of Homosexual Teens, Star–Ledger* (Newark), July 8, 1990, § 2, at 11.

Later that month, Dale received a letter from Monmouth Council Executive James W. Kay, revoking his BSA membership. The

letter asked Dale to "sever any relations [he] may have with the Boy Scouts of America," and granted Dale sixty days to request a review of his termination from the Monmouth Council Regional Review Committee.

Dale wrote to Kay on August 8, 1990, and requested the basis for the Monmouth Council's decision. In a letter dated August 10, 1990, Kay notified Dale that the "grounds for [his] membership revocation" were "the standards for leadership established by the Boy Scouts of America, which specifically forbid membership to homosexuals." [4] On September 30, 1990, Dale wrote a letter to the Northeast Regional Director, Rudy Flythe, asking for a review of his membership decision and a copy of BSA's leadership standards. Dale also requested permission to attend the review, a right to which he was entitled under the Monmouth Council Review Procedures. The Regional Review Committee acknowledged receipt of Dale's request, but neglected to provide him with a copy of the BSA standards for leadership or a review date.

In another letter dated October 16, 1990, Dale once again asked for a copy of the leadership standards and notice of the review date. On November 27, 1990, Charles Ball, the Assistant Regional Director of the Northeast Region, notified Dale that the "Northeast Region, [BSA] Review Committee supports the decision of the Monmouth Council ... to deny your registration with [BSA]," and granted Dale thirty days to seek review by the National Council Review Committee. Three weeks later, through counsel, Dale wrote to the Chief Scout Executive of BSA and requested a rehearing and an opportunity to attend the review. BSA's counsel informed Dale on December 21, 1990, that he had been denied the

---

[4] Dale subsequently learned that in 1978 BSA had prepared a position paper stating that "an individual who openly declares himself to be a homosexual [may not] be a volunteer scout leader [or] ... a registered unit member[.]" The position paper "was never distributed." Statements were also written in 1991 and 1993 expressing similar positions. These statements were written after the onset of litigation in other states charging the organization with discrimination against members on the basis of sexual orientation.

right to attend because: "[BSA] does not admit avowed homosexuals to membership in the organization so no useful purpose would apparently be served by having Mr. Dale present at the regional review meeting." BSA did agree, however, to have the National Council review Dale's membership revocation. Because Dale believed that a National Council review "would be futile," he initiated these legal proceedings.

## II

### *PROCEDURAL HISTORY*

On July 29, 1992, Dale filed a six-count complaint against BSA and Monmouth Council in the Superior Court of New Jersey. Dale alleged that Boy Scouts had violated the New Jersey Law Against Discrimination and common law by revoking his membership based solely on his sexual orientation. He sought declaratory, injunctive, compensatory and punitive monetary relief, as well as costs and attorney fees.

### A. *Chancery Division*

Dale moved for partial summary judgment in September 1993, demanding immediate reinstatement based on his claim that defendants had violated the LAD and New Jersey's public policy. Defendants, in response, cross-moved for summary judgment on all counts. The court denied Dale's motion and granted Boy Scouts' cross-motion. *Dale v. Boy Scouts of Am.*, No. MON–C–330–92 (Ch. Div. Nov. 3, 1995). After concluding that Dale was "a sexually active homosexual," the court found that Boy Scouts had always had a policy of excluding "active homosexual[s]." *Id.* at 6, 38. The court opined that homosexual acts are immoral and attributed to Boy Scouts a longstanding antipathy toward such behavior. *Id.* at 39–40. In the judge's view, "[i]t [was] unthinkable ... that the BSA could or would tolerate active homosexuality if discovered in any of its members." *Id.* at 40.

As to the applicability of the LAD, the court held that Boy Scouts was not a place of public accommodation, or alternatively, that Boy Scouts was exempt under the "distinctly private" exception found at *N.J.S.A.* 10:5–5*l*. *Id.* at 55. The court rejected Dale's common law claim, finding that the State's policy "is that established by the NJLAD ... [and] not some prior common law policy." *Id.* at 45. Because the court believed that Boy Scouts' moral position in respect of active homosexuality was clear, it found that Boy Scouts' First Amendment freedom of expressive association "prevent[ed] government from forcing [the organization] to accept Dale as an adult leader-member." *Id.* at 71.

## B. *Appellate Division*

The Appellate Division affirmed the dismissal of Dale's common law claim, but otherwise reversed and remanded for further proceedings. *Dale v. Boy Scouts of Am.,* 308 *N.J.Super.* 516, 523, 706 *A.*2d 270 (App.Div.1998). In a separate opinion, Judge Landau concurred with the majority's holding that Boy Scouts should restore Dale's membership, but dissented from the majority "to the extent it would compel the Boy Scouts to accept ... Dale ... [in] any Scout leadership position." *Id.* at 564, 706 *A.*2d 270.

The majority held that Boy Scouts, a "place of public accommodation," had violated the LAD by denying Dale the "privilege" of serving as a volunteer assistant scoutmaster based solely on his sexual orientation. Boy Scouts was a "public accommodation" because it "invite[d] 'the public at large,'" was "dependent upon the broad-based participation of members of the general public," "engage[d] in advertising and public promotion," shared "many attributes in common with" the places and activities enumerated in the LAD, and had "historic[ally] partner[ed] with various public entities and public service organizations." *Id.* at 536, 539, 706 *A.*2d 270. "For the [same] reasons," the court "summarily" rejected Boy Scouts' argument that it was exempt from the LAD under the "distinctly private" exception. *Id.* at 540, 706 *A.*2d 270. The court dismissed Dale's common law claim, finding Dale had

"not demonstrate[d] that a common law cause of action would vindicate any additional interests." *Id.* at 543, 706 *A.*2d 270. Consequently, the common law claim was held merely "duplicative of the LAD claim." *Id.* at 541, 706 *A.*2d 270.

On Boy Scouts' federal constitutional claims, the Appellate Division ruled that Boy Scouts was not protected by either the right to freedom of intimate association or to expressive association "inferred from other rights and protections guaranteed by the constitution" and found in the First Amendment. *Id.* at 544–45, 706 *A.*2d 270. The court quickly disposed of Boy Scouts' freedom of intimate association argument, observing that the organization "consists of nearly 5,000,000 members[,] . . . is open to all boys[,] . . . engages in aggressive advertising and undertakes a variety of special interest activities in schools and other public forums." *Id.* at 546, 706 *A.*2d 270. Based on those characteristics, the court held that Boy Scouts "lacks the distinctive qualities that might afford constitutional protections under this component of the First Amendment." *Ibid.*

In respect of Boy Scouts' freedom of expressive association claim, the majority "conclude[d] that enforcement of the LAD by granting plaintiff access to the accommodations afforded by scouting will not affect in 'any significant way' BSA's ability to express [its] views and to carry out [its] activities." *Id.* at 550, 706 *A.*2d 270. Noting "the tension between the freedom to associate for the purpose of expressing fundamental views and the compelling state interest in eradicating discrimination," the court found that the "organization or club asserting the freedom has a substantial burden of demonstrating a strong relationship between its expressive activities and its discriminatory practice." *Id.* at 548, 706 *A.*2d 270. Although the court accepted the argument that the First Amendment protects Boy Scouts' goals and activities, it determined that the relationship between Boy Scouts' stated goals and Boy Scouts' exclusionary practice was not significant enough to overcome the compelling state interest in eradicating invidious discrimination. *Id.* at 549–50, 706 *A.*2d 270.

In its analysis, the Appellate Division focused on Boy Scouts' " 'expressive purpose,' [which] is not to condemn homosexuality," but to "instill values in young people." *Id.* at 549, 550, 706 *A.*2d 270. The court found that "enforcement of the LAD by granting plaintiff access to the accommodations afforded by scouting will not affect in 'any significant way' [Boy Scouts'] ability to express these views and to carry out these activities." *Id.* at 550, 706 *A.*2d 270. The court observed that the LAD "does not aim at the suppression of speech," and "[n]othing . . . suggests that a male, simply because he is gay, will somehow undermine [Boy Scouts'] fundamental beliefs and teachings." *Id.* at 550, 552, 706 *A.*2d 270. Boy Scouts' 1991 and 1993 position statements were rejected as representations of the "collective 'expression' " of Boy Scouts because these papers were issued at "a time when [Boy Scouts'] anti-gay policy was subject to judicial challenge in California"; "such policy [had] not been incorporated into [Boy Scouts'] bylaws, rules, regulations and handbooks"; the position expressed "hardly squares with the view shared by a substantial percentage of church groups who sponsor local boy scout troops"; and Boy Scouts "has not attempted to exclude" religious institutions and heterosexual scouts who "have condemned [Boy Scouts'] anti-gay policy." *Id.* at 554–55, 556, 706 *A.*2d 270.

The Appellate Division distinguished *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 *U.S.* 557, 115 *S.Ct.* 2338, 132 *L.Ed.*2d 487 (1995), a case that held parade organizers have "the autonomy to choose the content of [their] own message," *id.* at 573, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503. The court pointed out that, unlike *Hurley, Dale* does not involve "pure forms of speech" or a "plaintiff [who] is . . . asserting a right . . . to alter the content of [Boy Scouts'] viewpoint." *Dale, supra,* 308 *N.J.Super.* at 559, 560, 706 *A.*2d 270. The court refused to accept Boy Scouts' allegation that Dale's "public declaration that he is gay in and of itself constitutes 'expressive activity' sufficient to forfeit his entitlement to membership in the BSA." *Id.* at 560, 706 *A.*2d 270. "In [the court's] view, there is a patent inconsistency in the notion that a gay scout leader who keeps his 'secret'

hidden may remain in scouting and one who adheres to the scout laws by being honest and courageous enough to declare his homosexuality publicly must be expelled." *Ibid.*

Judge Landau concurred with the majority's determination that Dale's adult membership could not be terminated, but dissented on whether Dale could be removed from his leadership position in the troop. Although Judge Landau refused to look behind Boy Scouts' claim that its "fundamental" message would be altered if an avowed homosexual served as an assistant scoutmaster, *id.* at 563, 706 A.2d 270, in his view Boy Scouts' message was ultimately irrelevant. According to Judge Landau, "Boy Scouts['] ... right of unfettered advocacy" is violated when Dale is reinstated as a leader "whether or not the Boy Scouts' stand on homosexuality is fundamental to that organization's creation." *Id.* at 564, 706 A.2d 270.

### III

### *STATE LAW CLAIMS*

#### A. *The LAD*

We first consider whether Boy Scouts is subject to the LAD, which provides that "[a]ll persons shall have the opportunity ... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, ... without discrimination because of ... affectional or sexual orientation." *N.J.S.A.* 10:5–4. Boy Scouts must therefore abide by the LAD if Boy Scouts is a place of public accommodation and does not meet any of the LAD exceptions. *See, e.g., N.J.S.A.* 10:5–5*l* (exempting "distinctly private" entities, religious educational facilities, and parents or individuals acting "in loco parentis" in respect of "the education and upbringing of a child").

#### 1. *Place of Public Accommodation*

■ "[T]he overarching goal of the [LAD] is nothing less than the eradication 'of the cancer of discrimination.'" *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 A.2d 652 (quoting *Jackson v.*

*Concord Co.*, 54 *N.J.* 113, 124, 253 *A.*2d 793 (1969)), *cert. denied*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L. Ed.*2d 51 (1988). "[D]iscrimination threatens not only the rights and proper privileges of the inhabitants of [New Jersey,] but menaces the institutions and foundation of a free democratic State." *N.J.S.A.* 10:5–3. In furtherance of its purpose to root out discrimination, the Legislature has directed that the LAD "shall be liberally construed." *Ibid.* We have adhered to that legislative mandate by historically and consistently interpreting the LAD " 'with that high degree of liberality which comports with the preeminent social significance of its purposes and objects.' " *Andersen v. Exxon Co.*, 89 *N.J.* 483, 495, 446 *A.*2d 486 (1982) (quoting *Passaic Daily News v. Blair*, 63 *N.J.* 474, 484, 308 *A.*2d 649 (1973)).

A clear understanding of the phrase "place of public accommodation" is critical. That is because "place of public accommodation" is, in large measure, determinative of the LAD's scope. Certainly, if the statute is broadly applicable, the antidiscriminatory impact of its provisions is greater. The Legislature's finding that the effects of discrimination are pernicious, and its directive to liberally construe the LAD, have informed our cases interpreting the reach of "place of public accommodation."

### a. *Place*

In 1965, the Court held that places of public accommodation were not limited to those enumerated in the statute. *Fraser v. Robin Dee Day Camp*, 44 *N.J.* 480, 486, 210 *A.*2d 208 (1965) (then *N.J.S.A.* 18:25–5(*l*)). At that time, the statutory definition used the word "include" to preface a list of specific "places" of public accommodation. *See id.* at 485, 210 *A.*2d 208. We reasoned that the Legislature's choice of the word "include" indicated that the "places" expressly mentioned were "merely illustrative of the accommodations the Legislature intended to be within the scope of the statute. Other accommodations, similar in nature to those enumerated, were also intended to be covered." *Id.* at 486, 210 *A.*2d 208. Less than a year later, the Legislature amended the LAD to expressly state that " 'a place of public accommodation'

shall include, *but not be limited to* " the various examples identified, *L.* 1966, *c.* 17 (emphasis added), thereby reaffirming our broad construction of the statutory language.[5]

Later, the word "place" became a further source of legal dispute. In *National Organization of Women v. Little League Baseball, Inc.*, 67 *N.J.* 320, 338 *A.*2d 198 (1974), we affirmed the decision of the Appellate Division holding that: "[t]he statutory noun 'place' . . . is a term of convenience, not of limitation[,] . . . employed to reflect the fact that public accommodations are commonly provided at fixed 'places.'" 127 *N.J.Super.* 522, 531,

---

[5] *N.J.S.A.* 10:5–5*l* now reads:

"A place of public accommodation" shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post secondary school from using in good faith criteria other than race, creed, color, national origin, ancestry or affectional or sexual orientation in the admission of students.

318 *A*.2d 33 (App.Div.1974). The defendant in *Little League* was a chartered baseball league that excluded girls between the ages of eight and twelve years from participation in its programs. The league contended that it did not come "within the meaning of the statute, primarily because it [was] a membership organization which does not operate from any fixed parcel of real estate in New Jersey of which it had exclusive possession by ownership or lease." *Id.* at 530, 318 *A*.2d 33. The court rejected that narrow view of "place":

> The "place" of public accommodation in the case of Little League is obviously the ball field at which tryouts are arranged, instructions given, practices held and games played. The statutory "accommodations, advantages, facilities and privileges" at the place of public accommodation is the entire agglomeration of the arrangements which Little League and its local chartered leagues make and the facilities they provide for the playing of baseball by the children.
>
> [*Id.* at 531, 318 *A*.2d 33 (citations omitted).]

In New Jersey, "place" has been more than a fixed location since 1974.

As Boy Scouts correctly observes, other jurisdictions interpreting their antidiscrimination laws have found "place" to be a limiting factor encompassing only a fixed location. *See, e.g., Welsh v. Boy Scouts of Am.*, 993 *F*.2d 1267, 1269 (7th Cir.) (holding that Boy Scouts is not "place of public accommodation" under Title II of Civil Rights Act of 1964 because "Congress when enacting § 2000a(b) never intended to include membership organizations that do not maintain a close connection to a structural facility within the meaning of 'place of public accommodation' "), *cert. denied*, 510 *U.S.* 1012, 114 *S.Ct.* 602, 126 *L.Ed.*2d 567 (1993); *United States Jaycees v. Richardet*, 666 *P*.2d 1008, 1011 (Alaska 1983) (stating that "the word 'place' .... would not encompass a service organization lacking a fixed geographical situs"); *United States Jaycees v. Bloomfield*, 434 *A*.2d 1379, 1381 (D.C.1981) (disagreeing with lower court's conclusion that "it is not necessary that there be a building ... in order to categorize an existing entity as a place of public accommodation"); *United States Jaycees v. Iowa Civil Rights Comm'n*, 427 *N.W.*2d 450, 454 (Iowa 1988) (stating that "United States Jaycees is not a 'place' within

our definition of 'public accommodation' "); *United States Jaycees v. Massachusetts Comm'n Against Discrimination*, 391 *Mass.* 594, 463 *N.E.*2d 1151, 1156 (1984) (finding that Massachusetts antidiscrimination law "does not apply to [a] membership organization, since such an organization does not fall within the commonly accepted definition of 'place' ").

We observe that not all jurisdictions have interpreted "place" so narrowly. The New York Court of Appeals has held that a "place of public accommodation need not be a fixed location, it is the place where petitioners do what they do," including "the place where petitioners' meetings and activities occur." *United States Power Squadrons v. State Human Rights Appeal Bd.*, 59 *N.Y.*2d 401, 465 *N.Y.S.*2d 871, 452 *N.E.*2d 1199, 1204 (1983). The Supreme Court of Minnesota has also approved a flexible construction of the term "place." In *United States Jaycees v. McClure*, 305 *N.W.*2d 764, 773 (Minn.1981), the Minnesota court agreed with the *Little League* premise that a " 'place of public accommodation' . . . is less a matter of whether the organization operates on a permanent site, and more a matter of whether the organization engages in activities in places to which an unselected public is given an open invitation."

Despite numerous additions and modifications to the LAD in the twenty-four years since *Little League* was decided, the New Jersey Legislature has not enacted a limiting definition of place. *See Massachusetts Mutual Life Ins. Co. v. Manzo*, 122 *N.J.* 104, 116, 584 *A.*2d 190 (1991) (stating that "[t]he Legislature's failure to modify a judicial determination, while not dispositive, is some evidence of legislative support for the judicial construction of a statute . . . . [especially when] the Legislature has amended [the] statute several times without altering the judicial construction"). We decline now to construe "place" so as to include only membership associations that are connected to a particular geographic location or facility. As the Appellate Division has so aptly pointed out, "[t]o have the LAD's reach turn on the definition of 'place' is irrational because 'places do not discriminate; people who own

and operate places do.'" *Dale, supra,* 308 *N.J.Super.* at 533, 706 *A.*2d 270 (quoting *Welsh, supra,* 993 *F.*2d at 1282 (Cummings, J., dissenting)). A membership association, like Boy Scouts, may be a "place" of public accommodation even if the accommodation is provided at "a moving situs." *Little League, supra,* 127 *N.J.Super.* at 531, 318 *A.*2d 33. In this case it is readily apparent that the various locations where Boy Scout troops meet fulfill the LAD "place" requirement.

### b. *Public Accommodation*

■ Our case law identifies various factors that are helpful in determining whether Boy Scouts is a "public accommodation." We ask, generally, whether the entity before us engages in broad public solicitation, whether it maintains close relationships with the government or other public accommodations, or whether it is similar to enumerated or other previously recognized public accommodations.

Broad public solicitation has consistently been a principal characteristic of public accommodations. Our courts have repeatedly held that when an entity invites the public to join, attend, or participate in some way, that entity is a public accommodation within the meaning of the LAD. *See, e.g., Clover Hill Swimming Club, Inc. v. Goldsboro,* 47 *N.J.* 25, 33, 219 *A.*2d 161 (1966) (stating that "[a]n establishment which by advertising or otherwise extends an invitation to the public generally is a place of public accommodation"); *Sellers v. Philip's Barber Shop,* 46 *N.J.* 340, 345, 217 *A.*2d 121 (1966) (stating that "[a]n establishment which caters to the public or by advertising or other forms of invitation induces patronage generally is a place of public accommodation"); *Fraser, supra,* 44 *N.J.* at 488, 210 *A.*2d 208 (stating that "[i]n light of the nature of the facilities and activities offered to the general public by respondent's day camp, we hold that it is a public accommodation"); *Little League, supra,* 127 *N.J.Super.* at 531, 318 *A.*2d 33 (stating that "Little League is a public accommodation because the invitation is open to children in the community at

large"); *Evans v. Ross*, 57 *N.J.Super.* 223, 231, 154 *A.*2d 441 (App.Div.) (stating that LAD requires "an establishment which caters to the public, and by advertising or other forms of invitation induces patronage generally, [not to] refuse to deal with members of the public who have accepted the invitation"), *certif. denied*, 31 *N.J.* 292, 157 *A.*2d 362 (1959); *see also Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 *F.*2d 468, 475 (3d Cir.1986) (stating that LAD applies whenever "the organization or club ... invite[s] an unrestricted and unselected public to join as members"); *Brounstein v. American Cat Fanciers Ass'n*, 839 *F.Supp.* 1100, 1107 (D.N.J. 1993) (stating that " 'primary [public accommodation] consideration' " under LAD is " 'whether the invitation to gather is open to the public at large' ") (quoting *Kiwanis Int'l, supra*, 806 *F.*2d at 474).

BSA engages in broad public solicitation through various media. In 1989, for example, BSA spent more than $1 million on a national television advertising campaign. A *New York Times* article describes one of Boy Scouts' "hip" television ads, quoting a BSA spokesman as stating, "scouting [is] a product and we've got to get the product into the hands of as many consumers as we can."[6] Kim Foltz, *TV Ad's Hip Pitch: It's 'Cool' to be a Boy Scout, N.Y. Times*, Oct. 30, 1989. BSA has also advertised in widely distributed magazines, such as *Sports Afield* and *Redbook*. Local Boy Scout councils engage in substantial public solicitation. BSA frequently supplies the councils with recruiting materials, such as television and radio public service announcements, advertisements, and other promotional products. Monmouth Council, in particular, has expressly invited the public by conducting recruiting drives and by providing local troops with BSA-produced posters and promotions aimed at attracting new members.

---

[6] Boy Scouts expresses concern that this article is not properly part of the record before us. Although the quoted statement has not been authenticated, we find it descriptive of material in the record respecting BSA's public solicitation and membership recruitment efforts.

Boy Scout troops also take part in perhaps the most powerful invitation of all, albeit an implied one: the symbolic invitation extended by a Boy Scout each time he wears his uniform in public. *See Sellers, supra,* 46 *N.J.* at 345, 217 *A.*2d 121 (finding that barber shop's pole extended implied invitation to public). A boy in a uniform may well be Boy Scouts' strongest recruiting tool. By encouraging scouts to wear their uniforms to school, and when participating in "School Nights" and public demonstrations, Boy Scouts invites the curiosity and awareness of others in the community. Boy Scouts admits that it encourages these displays in the hope of attracting new members.

■ On the facts before us, it cannot be controverted that Boy Scouts reaches out to the public in a myriad of ways designed to increase and sustain a broad membership base. Whether by advertising or active recruitment, or through the symbolism of a Boy Scout uniform, the intent is to send the invitation to as many members of the general public as possible. Once Boy Scouts has extended this invitation, the LAD requires that all members of the public must "have equal rights ... and not be subjected to the embarrassment and humiliation of being invited[,] ... only to find [the] doors barred to them." *Evans, supra,* 57 *N.J.Super.* at 231, 154 *A.*2d 441.

Boy Scouts is a "public accommodation," not simply because of its solicitation activities, but also because it maintains close relationships with federal and state governmental bodies and with other recognized public accommodations. Our cases have held that certain organizations that benefit from relationships with the government and other public accommodations are themselves places of public accommodation within the meaning of the LAD. In *Little League,* for example, the court concluded that Little League was "public in the added sense that local governmental bodies characteristically make the playing areas available to the local leagues, ordinarily without charge." 127 *N.J.Super.* at 531, 318 *A.*2d 33, *aff'd,* 67 *N.J.* 320, 338 *A.*2d 198 (1974). More recently, in *Frank v. Ivy Club,* 120 *N.J.* 73, 79, 110, 576 *A.*2d 241 (1990), a

female student sought membership in the all-male eating clubs at Princeton University. Although they did not publicly solicit new members, we held that the clubs' close relationship to the University, a place of public accommodation, rendered them subject to the LAD. *Id.* at 110, 576 *A.*2d 241.

It is clear that Boy Scouts benefits from a close relationship with the federal government. Indeed, BSA was chartered by Congress in 1916, 36 *U.S.C.A.* § 30901, and has been the recipient of equipment, supplies, and services from the federal government, also by act of Congress, 10 *U.S.C.A.* § 2544. Thus, the Secretary of Defense, 10 *U.S.C.A.* § 2544(a), and other departments of the federal government, 10 *U.S.C.A.* § 2544(h), have been authorized to

> lend to the Boy Scouts of America, for the use and accommodation of Scouts, Scouters, and officials who attend any national or world Boy Scout Jamboree, such cots, blankets, commissary equipment, flags, refrigerators, and other equipment and without reimbursement, furnish services and expendable medical supplies, as may be necessary or useful to the extent that items are in stock and items or services are available.
>
> [10 *U.S.C.A.* § 2544(a).]

Since its inception, BSA has maintained a special association with each successive President of the United States. According to a BSA public relations fact sheet:

> One of the causes contributing to the success of the Boy Scouts of America has been the thoughtful, wholehearted way in which each President of the United States since William Howard Taft in 1910 has taken an active part in the work of the movement. Each served as Honorary President during his term in office.

Another fact sheet states that seventy-eight percent of the members of the 100th Congress participated in scouting.

Boy Scouts also maintains a close relationship with the military. According to a BSA pamphlet entitled *Organizations That Use Scouting*, "military personnel serve Scouting in many capacities." "At many [Army, Navy, Air Force, and National Coast Guard] installations, facilities are available for Scouting shows, meetings, training activities," and other "similar Scouting events." Monmouth Council, in particular, has used the New Jersey military installation known as Fort Monmouth.

Likewise, state and local governments have contributed to Boy Scouts' success.[7] In New Jersey, the Legislature has authorized the Division of Fish, Game and Wildlife in the Department of Environmental Protection to "stock with fish any body of water in this state that is under the control of and for the use of ... Boy Scouts," *N.J.S.A.* 23:2–3, and has exempted Boy Scouts from having to pay motor vehicle registration fees, *N.J.S.A.* 39:3–27. Local governmental agencies, such as fire departments and law enforcement agencies, serve Boy Scouts by sponsoring scouting units. Nationally, over 50,000 youth members belong to units sponsored by fire departments, whereas in New Jersey alone over 130 units are sponsored by fire departments and over 100 units are sponsored by law enforcement agencies.

Perhaps Boy Scouts' connection to public schools and school-affiliated groups constitutes its single most beneficial governmental relationship. *Organizations That Use Scouting* advises that "the education field holds our greatest potential." Boy Scouts currently recruits many of its members through its presence in and use of school facilities. A large percentage of scouting units nationally, as well as in New Jersey, are chartered by public schools and affiliated organizations.

Moreover, public schools and community colleges often host scouting meetings, activities, and recruiting events such as "School Nights." "School Night for Scouting [is a] recruiting plan operated by many councils in connection with the schools." Under this plan, an open scout meeting is held at a school in order to encourage students to join scouting. Public schools not only aid Boy Scouts by allowing the organization to use their facilities after school, but also during the school day. According to Boy Scouts, "[m]ore and more of our schools are becoming available for other than formal education.... In-school Scouting, where the pack,

---

[7] New Jersey governmental entities are, of course, bound by the LAD. Their sponsorship of, or conferring of special benefits on, an organization that practices discrimination would be prohibited.

troop, team, or post meets during the school day, is recognized in many areas." In 1992, close to 700,000 students throughout the nation were taught the Boy Scouts' *Learning for Life* curriculum during the school day.

Given Boy Scouts' public solicitation activities, and considering its close relationship with governmental entities, it is not surprising that Boy Scouts resembles many of the recognized and enumerated places of public accommodation. Similarity to the places of public accommodation listed in the LAD has been a benchmark for determining whether the unlisted entity should be included. *Cf. Board of Chosen Freeholders v. New Jersey,* 159 *N.J.* 565, 576, 732 *A.*2d 1053 (1999) (stating that "[u]nder the *ejusdem generis* principle of statutory construction, when specific words follow more general words in a statutory enumeration, we can consider what additional items might also be included by asking whether those items are similar to those enumerated"). In *Fraser v. Robin Dee Day Camp,* for example, this Court held that a "day camp is the type of accommodation which the Legislature intended to reach" because a "day camp offers accommodations which have many attributes in common with swimming pools, recreation and amusement parks, motion picture houses, theatres, music halls, gymnasiums, kindergarten and primary schools, all of which are specifically enumerated" in the LAD. 44 *N.J.* at 487, 210 *A.*2d 208. The Appellate Division in *Little League* identified Little League's " 'educational or recreational nature' " as a basis for the court's conclusion that Little League was similar to the types of public accommodations listed in the statute. 127 *N.J.Super.* at 531, 318 *A.*2d 33 (quoting *Fraser, supra,* 44 *N.J.* at 487, 210 *A.*2d 208). Similarly, Boy Scouts' educational and recreational nature, like the day camp in *Fraser* or the baseball teams in *Little League,* further supports our conclusion that Boy Scouts is a "place of public accommodation" under the LAD. *See, e.g., Advancement Guidelines* 4 (1992 ed.) (stating that "[e]ducation and fun are functions of the scouting movement").

## 2. *LAD Exceptions*

Boy Scouts claims that even if it is a place of public accommodation, it is nonetheless exempt from the LAD under three express exceptions: (1) the "distinctly private" exception; (2) the religious educational facility exception; and (3) the *in loco parentis* exception. *N.J.S.A.* 10:5–5*l.* Because we determine that these exceptions do not apply to Boy Scouts, we hold that Boy Scouts is subject to the LAD.

"While this Court has been scrupulous in its insistence that the [LAD] be applied to the full extent of its facial coverage, it has never found such coverage to exist in the face of an unambiguous exclusion." *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 68, 389 *A.*2d 465 (1978) (citations omitted). Nonetheless, despite our adherence to statutory exceptions expressly and unambiguously set forth by the Legislature, we are mindful that "[e]xemptions from remedial statutes should generally be narrowly construed." *Poff v. Caro,* 228 *N.J.Super.* 370, 379, 549 *A.*2d 900 (Law Div.1987) (citing *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 559, 362 *A.*2d 13 (1976)).

We begin with the "distinctly private" exception. The LAD provides that "[n]othing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private." *N.J.S.A.* 10:5–5*l.* Boy Scouts' status as a bona fide club has not been questioned. Our focus is, therefore, on the meaning of "distinctly private." We agree with the New York Court of Appeals that this language, found in both the New York Human Rights Law, *N.Y. Exec. Law* § 292, and in the LAD, is intended as a narrowly drawn statutory exclusion. *Power Squadrons, supra,* 465 *N.Y.S.*2d 871, 452 *N.E.*2d at 1204 (stating that this exception "does not refer simply to private clubs or establishments closed to the public but uses more restrictive language excluding from the statute's provisions only clubs which are 'distinctly private' "). Boy Scouts bears the burden of proving that it fits within this narrow exception. *Cf. Spragg v. Shore Care & Shore Mem'l*

*Hosp.*, 293 *N.J.Super.* 33, 51, 679 *A.*2d 685 (App.Div.1996) (holding burden of proof on defendant-employer to prove bona fide occupational qualification exception to LAD).

In deciding whether Boy Scouts is a place of public accommodation, we considered the organization's public solicitation activities. Solicitation of a broad membership base is closely related to the issue of selectivity in membership, which may explain why various courts have considered both factors in their analyses of both "place of public accommodation" and the "distinctly private" exception. *See, e.g., Kiwanis, supra*, 806 *F.*2d at 476 (stating that "distinctly private" exception "represents the other side of the 'public accommodation' coin .... because of the emphasis placed on 'selectivity' as the standard for determining 'public accommodation,' as well as for determining if a club is 'distinctly private' "). We have reviewed the multiple ways in which Boy Scouts reaches out to the public and, therefore, will consider the selectivity issue as the principal determinant of "distinctly private" status. *See Power Squadrons, supra*, 465 *N.Y.S.*2d 871, 452 *N.E.*2d at 1204 (stating that "the essence of a private club is selectivity in its membership").

Thirty-three years ago, in *Clover Hill Swimming Club, Inc. v. Goldsboro*, we said that "not every establishment using the 'club' label can be considered 'distinctly private.' Self-serving declarations by ... an accommodation are not determinative of its character." 47 *N.J.* at 34, 219 *A.*2d 161. Although the swimming club had represented to the public that "all applications [for membership] would be subject to approval by club officials," it appeared that Clover Hill was only selective when black families applied. *Ibid.* The Court refused to accept bogus representations concerning the "private" nature of the club when it was quite clear that membership was generally open and had to do with a family's interest in recreation and not much else. *Ibid. Little League*, citing *Clover Hill*, primarily relied on the baseball league's "open [invitation] to children in the community at large, with no restriction (other than sex) whatever" as a basis for the court's finding

that the league was a "public accommodation." 127 *N.J.Super.* at 531, 318 *A.*2d 33. The lack of any membership selectivity—except for the prohibition against the admission of girls—weighed in the public accommodation calculus; it also bears upon the "distinctly private" exception.

*Kiwanis International v. Ridgewood Kiwanis Club* is the only case to hold a club exempt under the "distinctly private" exception. 806 *F.*2d at 477. The Third Circuit, relying on *Little League,* applied a selectivity analysis to determine whether Kiwanis Ridgewood was a public accommodation and, therefore, not "distinctly private." *Id.* at 476-77. The court found that the local club was selective based on its membership practices, which were described as follows:

> The Ridgewood club is small, comprised of only twenty-eight members. Ten individuals have been members for over twenty years. Indeed, Kiwanis Ridgewood has admitted no more than twenty members over the course of the past decade. Each new member had to be sponsored by a current member, and formally voted in by the Ridgewood Board of Directors. The sponsorship of the existing member acted as a primary screening mechanism in the maintenance of the quality of membership. In addition to national membership requirements, Kiwanis Ridgewood established several local membership requirements, which included, among others, the candidate's willingness to pray at meetings and to recite the pledge of allegiance.

> Although Kiwanis International has encouraged large-scale membership solicitation in the past, the suggested "membership roundup" mailings were sent only to those prospects already known by current members. These individuals would be invited to a Kiwanis meeting to determine their compatibility with the organization's goals and members. The scope of these membership drives was limited. Not only did every solicited individual have to be known by an existing member, but every applicant out of that group of solicited individuals would have to be sponsored by an existing member.

> [*Id.* at 475.]

Unlike Kiwanis Ridgewood, which used "sponsorship [by an] existing member . . . as a primary screening mechanism in the maintenance of . . . quality membership," Boy Scouts does not require new members "to be sponsored by a current member." *Ibid.* Nor does Boy Scouts limit its recruiting, or invitations to the public, to individuals who are "known by an existing member." To the contrary, Boy Scout publications indicate that the organization

seeks a broad membership base. In a booklet, entitled *A Representative Membership,*[8] Boy Scouts states that its "national objective, as well as for regions, areas, councils, and districts is to see that *all* eligible youth have the opportunity to *affiliate* with the Boy Scouts of America." *Id.* at 1 (emphasis added). The booklet is emphatically inclusive:

> We have high hopes for our nation's future. These hopes cannot flower if *any* part of our citizenry feels deprived of the opportunity to help shape the future. How can you persuade other Scouters to accept a commitment to a representative membership? Consider these facts:
>
> 1. Our federal charter sets forth our obligation to serve boys. Neither the charter nor the bylaws of the Boy Scouts of America permits the exclusion of *any* boy. The National Council and Executive Board have always taken the position that Scouting should be available for *all* boys who meet the entrance age requirements.
>
> . . . .
>
> 4. Another aim of Scouting is the development of leadership. Leadership in America is needed in all sections of the country and in all economic, cultural, and ethnic groups.
>
> 5. To meet these responsibilities we have made a commitment that our membership shall be representative of *all* the population in every community, district, and council.
>
> [*Id.* at 2 (emphasis added).]

Boy Scouts' large membership further undercuts its claim to selective membership. Nationally, over four million boys and one million adults were Boy Scout members in 1992.[9] Since its inception, over 87 million people have joined Boy Scouts. In 1991,

---

[8] Boy Scouts also questions whether this booklet is properly before us. *See supra* at 590 n. 6, 734 *A.2d* at 1211 n. 6). The booklet on its face states that it is a BSA publication prepared for national, council, district, and local board/committee members, and Boy Scouts has not indicated otherwise.

[9] Boy Scouts argues that this Court should follow *Kiwanis, supra,* 806 *F.*2d at 476 n. 14, and limit review of Boy Scouts' membership selection practices to the local, rather than the national level. We decline to follow *Kiwanis* in this case. Boy Scouts' local units, unlike Kiwanis Ridgewood, are not authorized to establish additional "local membership requirements," *id.* at 475, nor are they empowered *generally to change BSA's policies. We find that the various levels of scouting are interrelated such that a review of the national organization's membership selection practices—as opposed to the local unit—is most appropriate.

Monmouth Council alone had over 8400 youths and over 2700 adult members. The New York Court of Appeals, construing "distinctly private" in *United States Power Squadrons v. State Human Rights Appeal Board,* has suggested that an organization's failure to limit its maximum membership, in and of itself, demonstrates that the club is not private: "Organizations which routinely accept applicants and place no subjective limits on the number of persons eligible for membership are not private clubs." 465 *N.Y.S.*2d 871, 452 *N.E.*2d at 1204. We note only that the size of the Boy Scout organization certainly implies an open membership policy.

Boy Scouts argues, however, that it is "distinctly private" because its Scout Oath and Scout Law constitute genuine selectivity criteria. In support of its position, Boy Scouts relies on *Welsh v. Boy Scouts of America,* wherein the Seventh Circuit stated:

> Although the Scouts intentionally admit a large number of boys from diverse backgrounds, admission to membership is not without exercise of sound discretion and judgment. This is evident from the Constitution and By-laws as well as the Boy Scouts' Oath and Scout Law.
>
> ... We hold therefore that the Scouts organization not only is selective, but that its very Constitution, By-laws and doctrine dictate that it remain selective.
>
> [993 *F.*2d at 1276–77.]

We acknowledge that Boy Scouts' membership application requires members to comply with the Scout Oath and Law. We do not find, however, that the Oath and Law operate as genuine selectivity criteria. To the contrary, the record discloses few instances in which the Oath and Law have been used to exclude a prospective member; in practice, they present no real impediment to joining Boy Scouts. Joining requirements are insufficient to establish selectivity where they do not function as true limits on the admission of members. *See Power Squadrons, supra,* 465 *N.Y.S.*2d 871, 452 *N.E.*2d at 1204 (requiring examination for basic boating course was not "selective" where club "place[d] no subjective limits on the number of persons eligible for membership"). Here, there is no evidence that Boy Scouts does anything but accept at face value a scout's affirmation of the Oath and Law. *See Roberts v. United States Jaycees,* 468 *U.S.* 609, 621,

104 *S.Ct.* 3244, 3251, 82 *L.Ed.*2d 462, 473 (1984) (finding group unselective where "new members are routinely recruited and admitted with no inquiry into their backgrounds").

Most important, it is clear that Boy Scouts does not limit its membership to individuals who belong to a particular religion or subscribe to a specific set of moral beliefs. Boy Scouts asserts that "[t]here is a close association between the Boy Scouts of America and virtually all religious bodies and denominations in the United States," and that each member's concept of "moral fitness" should be determined by his "courage to do what his head and heart tell him is right." *See supra* at 575–76, 734 *A.*2d at 1203. Moreover, Boy Scouts encourages its members to "respect and defend the rights of others whose beliefs may differ." *Scoutmaster Handbook, supra,* at 561. By its own teachings then, Boy Scouts is inclusive, not selective, in its membership practices.

Boy Scouts also argues that it is "distinctly private" because it is selective in its adult membership. In addition to the Scout Oath and Law requirements, adult members are bound by the Declaration of Religious Principle, and are subject to evaluation according to informal criteria designed to select only individuals capable of accepting responsibility for the moral education and care of other people's children in accordance with scouting values. Several of the Troop 73 leaders who were involved in Dale's adult membership approval have said that they would not have approved Dale's application had they known that Dale was an "avowed" homosexual, thus lending support to BSA's position.

■ The Appellate Division's analysis of Boy Scouts' adult membership selectivity dispels the notion that an open membership organization can claim the "distinctly private" exception because it is selective as to a small subset of the larger group:

> We reject the suggestion that the BSA organization as a whole is not a place of public accommodation because more stringent membership criteria are applied to a single component of the organization, its adult members. Such a result is clearly inconsistent with the remedial purposes of the LAD. Acceptance of the argument would mean that public clubs in *Clover Hill* and *Fraser,* are not places of public accommodation because their member-counselors or lifeguards are subject to more

stringent, enhanced training criteria. An extension of defendants' argument would be that the BSA is not a place of public accommodation because of the demanding standards that must be met to become an Eagle Scout.

[*Dale, supra,* 308 *N.J.Super.* at 538, 706 *A.*2d 270 (citations omitted).]

*See also Brounstein, supra,* 839 *F.Supp.* at 1107–08 (stating that "[t]he fact that an organization is selective with respect to the privileges and benefits it accords to members does not exempt that organization from the proscriptions of the LAD if it is otherwise a 'public place of accommodation' ").

 Boy Scouts accepts boys who come from diverse cultures and who belong to different religions. It teaches tolerance and understanding of differences in others. It presents itself to its members and to the public generally as a nonsectarian organization "available to all boys who meet the entrance age requirements." Its Charter and its Bylaws do not permit the exclusion of any boy. Boy Scouts is not "distinctly private" because it is not selective in its membership.

 Boy Scouts claims, however, that it is exempt from the LAD because it is an "educational facility operated or maintained by a bona fide religious or sectarian institution." *N.J.S.A.* 10:5–5*l.* This claim deserves little discussion. Boy Scouts repeatedly states that it is nonsectarian. Its Bylaws declare that no member shall be required "to take part in or observe a religious ceremony distinctly unique" to a church or other religious organization. Boy Scouts emphasizes that religious instruction is better reserved for "the home and the organization or group with which the member is connected." Further, the *Scoutmaster Handbook* instructs its leaders that scouting "is identified with no particular faith, encourages no particular affiliation, nor assumes functions of religious bodies." We cannot say that Boy Scouts is a "bona fide religious or sectarian institution" in the face of the organization's clear pronouncements on this subject.[10]

---

[10] That Boy Scouts' oath expresses a belief in God does not make it a religious institution. Nor does Boy Scouts' commitment to *"[e]ducation and fun," see*

■ Finally, Boy Scouts argues that requiring it to admit Dale frustrates "the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control." *N.J.S.A.* 10:5–5*l*. The right of a parent to provide for the custody, care, and nurturing of a child is well-established. *Ginsberg v. New York,* 390 *U.S.* 629, 639, 88 *S.Ct.* 1274, 1280, 20 *L. Ed.*2d 195, 203 (1968). In limited cases, that right is also extended to persons, like a stepparent, whose intent it is "to assume the parental relationship." *A.S. v. B.S.,* 139 *N.J.Super.* 366, 369, 354 *A.*2d 100 (Ch.Div.1976). Boy Scouts does not qualify as "one in loco parentis."

■ Our prior decisions indicate that the status of *in loco parentis* is reserved for individuals who function as a parent. *See, e.g., Miller v. Miller,* 97 *N.J.* 154, 162, 478 *A.*2d 351 (1984) (recognizing stepparent may have *in loco parentis* relationship); *In re M.S.,* 73 *N.J.* 238, 243–44, 374 *A.*2d 445 (1977) (finding juvenile shelter for delinquents stands *in loco parentis* ). Characteristics of that relationship include "the responsibility to maintain, rear and educate the child," *Miller, supra,* 97 *N.J.* at 162, 478 *A.*2d 351, as well as the duties of "supervision, care and rehabilitation," *In re M.S., supra,* 73 *N.J.* at 242, 374 *A.*2d 445; *see also A.S., supra,* 139 *N.J.Super.* at 369, 354 *A.*2d 100 (defining role as "one who means to put himself in the situation of the lawful father with reference to the father's office and duty of making provision for the child"). Boy Scouts does not assume those responsibilities or those duties. It does not maintain or rear children. A Boy Scout leader may function as a supervisor of children for limited periods of time; he does not have "the responsibility to maintain, rear and educate" children such that he stands in the place of a parent.

We hold that Boy Scouts is a "place of public accommodation" and is not exempt from the LAD under any of the statute's exceptions.

---

*supra* at 594, 734 *A.*2d at 1213 (emphasis added), qualify it as an "educational facility" under *N.J.S.A.* 10:5–5*l*.

### 3. *Have Boy Scouts Violated the LAD?*

■ *N.J.S.A.* 10:5–4 states that "[a]ll persons shall have the opportunity to obtain ... all the accommodations, advantages, facilities, and privileges of any place of public accommodation." Because we hold that an assistant scoutmaster position is a "privilege" and an "advantage" of Boy Scout membership, and because Boy Scouts has "revoked" Dale's registration based on his "avowed" homosexuality, a prohibited form of discrimination under the statute, we conclude that Boy Scouts has violated the LAD.

In Dale's revocation letter, Boy Scouts expressly stated that "BSA membership registration is a privilege." Boy Scouts has also taken the position that "adult membership" and "adult leadership" are "interchangeable" in the scouting world. *See supra* at 577, 734 *A.*2d at 1204. Boy Scouts' statements raise the question whether the organization has waived its right to challenge Dale's claim that he has been denied a "privilege" within the meaning of the LAD.

We find, nonetheless, that Boy Scout membership is both a "privilege" and "advantage." The organization provides its members with numerous benefits, including opportunities to participate in group activities and to develop a variety of skills, *e.g.*, camping, cooking, first aid, lifesaving. Boy Scout leaders are given the "advantage" of numerous training courses that teach valuable lessons in leadership and management. Scouting indirectly benefits its members through the "advantage" of a large influential network, including Air Force Academy, Annapolis and West Point graduates, Rhodes Scholars, astronauts, United States Presidents and Congressmen, as well as businessmen and community leaders. Indeed, Boy Scouts advertises the "privileges" and "advantages" of being a member in order to attract new members.[11] *See id.* at

---

[11] In *Quinnipiac Council Boy Scouts of America v. Commission on Human Rights and Opportunities*, 204 *Conn.* 287, 528 *A.*2d 352 (1987), the Connecticut Supreme Court held that Boy Scouts had not denied a woman an "accommodation," which it interpreted to mean "access to goods and services," when it

590, 734 *A*.2d at 1211. It is undeniable that Dale lost those "privileges" and "advantages" when he was expelled. It necessarily follows that Boy Scouts violated the LAD when it expelled him.

## B. *The Common Law*

Dale asserts that Boy Scouts is also prohibited from discriminating against him by the common law. The Legislature did not intend to abrogate all common law causes of action with the enactment of the LAD. *See N.J.S.A.* 10:5–27 ("Nothing herein contained shall bar, exclude or otherwise affect any right or action, civil or criminal, which may exist independently of any right to redress against or specific relief from any unlawful employment practice or unlawful discrimination."); *see also N.J.S.A.* 10:5–3 ("The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed *in combination with other protections* available under the laws of this State.") (emphasis added). In *Shaner v. Horizon Bancorp.*, we recognized that "a plaintiff in appropriate circumstances could pursue an independent action ... to vindicate particular interests in addition to or aside from those sought to be protected by a LAD action." 116 *N.J.* 433, 454, 561 *A*.2d 1130 (1989).

In many cases, however, a common law claim is merely duplicative of a LAD claim and "it might be unnecessary to recognize or create ... [an] action to vindicate substantially the same rights and provide similar relief." *Ibid.; accord Erickson v. Marsh & McLennan Co.,* 117 *N.J.* 539, 562, 569 *A*.2d 793 (1990). We find that Dale's common law claim, if pursued, would not protect an

---

denied her the opportunity to serve as a scoutmaster. *Id.* at 360. The Connecticut public accommodation statute interpreted by the Connecticut Supreme Court is distinguishable from our New Jersey statute. The LAD is not concerned solely with the denial of an "accommodation" or "goods and services," but rather prohibits places of public accommodation from refusing to provide "accommodations, advantages, facilities [or] privileges." *N.J.S.A.* 10:5–4. While volunteer scoutmaster positions may not be "goods [or] services," they are a "privilege" and an "advantage."

interest "in addition to or aside from those" protected by his statutory action. *Shaner, supra,* 116 *N.J.* at 454, 561 *A.*2d 1130. Accordingly, we hold that Dale's common law claim is duplicative of his LAD claim.

## IV

### *THE FIRST AMENDMENT*

Our holding that New Jersey's Law Against Discrimination applies to Boy Scouts requires that we reach Boy Scouts' claim that its First Amendment rights are thereby violated. *See U.S. Const.* amend. I. Boy Scouts asserts the rights of its members "to enter into and maintain ... intimate or private relationships .... [and] to associate for the purpose of engaging in protected speech." *Board of Dirs. of Rotary Int'l v. Rotary Club,* 481 *U.S.* 537, 544, 107 *S.Ct.* 1940, 1945, 95 *L.Ed.*2d 474, 483–84 (1987).

The United States Supreme Court has referred to the constitutionally protected freedom of association in two distinct contexts. "In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts, supra,* 468 *U.S.* at 617–18, 104 *S.Ct.* at 3249, 82 *L.Ed.*2d at 471. Those cases are typically referred to as "intimate association" cases. "In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618, 104 *S.Ct.* at 3249, 82 *L.Ed.*2d at 471. Those cases have been described as "expressive association" cases.

Boy Scouts' First Amendment claim requires that we examine the analytical framework within which the United States Supreme Court has discussed this complex of associational rights.

### A. *Freedom of Intimate Association*

"[B]ecause the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.* at 618, 104 *S.Ct.* at 3250, 82 *L.Ed.*2d at 471. The freedom to maintain personal relationships or to engage in intimate associations is thus "a fundamental element of liberty protected by the Bill of Rights." *Rotary Club, supra,* 481 *U.S.* at 545, 107 *S.Ct.* at 1945, 95 *L.Ed.*2d at 484. Although the Supreme Court has never set the "precise boundaries" of this freedom, "[t]he intimate relationships to which [it] has accorded constitutional protection include marriage, the begetting and bearing of children, child rearing and education, and cohabitation with relatives." *Id.* at 545, 107 *S.Ct.* at 1945–46, 95 *L.Ed.*2d at 484 (citations omitted). The freedom of intimate association, however, is not restricted to family relationships; rather, the Court has "emphasized that the First Amendment protects those relationships . . . that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences and beliefs but also distinctly personal aspects of one's life.' " *Id.* at 545, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 484 (quoting *Roberts, supra,* 468 *U.S.* at 619–20, 104 *S.Ct.* at 3250, 82 *L.Ed.*2d at 472).

Two seminal cases have considered the claims of national membership organizations that the intimate association rights of their members had been abridged by the application of state laws similar to the LAD. In *Roberts v. United States Jaycees,* the Jaycees brought an action contending that application of Minnesota's public accommodations law requiring the organization to admit women as regular members violated the male members' intimate association rights. Under the Jaycees' Bylaws, men between the ages of eighteen and thirty-five were eligible for regular membership, whereas only "associate membership" was available to women. *Roberts, supra,* 468 *U.S.* at 613, 104 *S.Ct.* at

3248, 82 *L.Ed.*2d at 468. Unlike regular members, associate members could not vote, hold office, or "participate in certain leadership training and awards programs." *Ibid.* Nonetheless, as associate members, women "attend[ed] various meetings, participate[d] in selected projects, and engage[d] in many of the organization's social functions." *Id.* at 621, 104 *S.Ct.* at 3251, 82 *L.Ed.*2d at 473.

Based on those facts, the Supreme Court concluded that "the Jaycees chapters lack[ed] the distinctive characteristics that might afford constitutional protection to the decision of its members to exclude women." *Id.* at 621, 104 *S.Ct.* at 3251, 82 *L.Ed.*2d at 474. Specifically, the Court emphasized that "the local chapters of the Jaycees are neither small nor selective," and that "much of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship." *Ibid.* At the time of trial, the local chapters involved in the suit had approximately 400 members, *id.* at 621, 104 *S.Ct.* at 3251, 82 *L.Ed.*2d at 473, and the organization had 295,000 members nationwide, *id.* at 613, 104 *S.Ct.* at 3246, 82 *L.Ed.*2d at 468. Furthermore, "[a]part from age and sex, neither the national organization nor the local chapters employ[ed] any criteria for judging applicants for membership." *Ibid.*

In *Board of Directors of Rotary International v. Rotary Club of Duarte,* the Court again considered a First Amendment challenge to a state antidiscrimination statute requiring a national membership organization to admit women. There, the charter of a local chapter of Rotary International was revoked by the national organization because it admitted women members. *Rotary Club, supra,* 481 *U.S.* at 541, 107 *S.Ct.* at 1943, 95 *L.Ed.*2d at 482. Under the Rotary constitution, women were excluded from membership, although "women [were] permitted to attend meetings, give speeches, and receive awards." *Id.* at 541, 107 *S.Ct.* at 1943, 95 *L.Ed.*2d at 481. The local chapter and two of its female members brought an action challenging the national organization's exclusionary policy under the California civil rights statute. *Id.* at

541, 107 *S.Ct.* at 1943, 95 *L.Ed.*2d at 482. Rotary International argued that requiring it to admit women would infringe on its right of intimate association.

Once again the Court concluded that "the relationship among [the organization's] members is not the kind of intimate or private relation that warrants constitutional protection." *Id.* at 546, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 484–85. The Court noted that local chapters ranged in size from "fewer than 20 [members] to more than 900," and that the national organization did not set an "upper limit on the membership of any local Rotary Club." *Id.* at 546, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 485. The Court also emphasized Rotary International's inclusive membership policy, pointing to the organization's own declaration that "[t]he purpose of Rotary 'is to produce an inclusive, not exclusive, membership.'" *Ibid.* In order to fulfill this purpose, "[t]he clubs ... [were] instructed to 'keep a flow of prospects coming' to make up for ... attrition and gradually to enlarge membership." *Ibid.* Most important, Rotary International's membership policy was designed to "'enabl[e] the club to be a true cross section of the business and professional life of the community.'" *Ibid.* On these facts, the Court concluded that "[s]uch an inclusive 'fellowship for service based on diversity of interest,' ... does not suggest the kind of private or personal relationship to which we have accorded protection under the First Amendment." *Id.* at 546–47, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 485.

Those cases teach us to consider, among other things, "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship," when we examine membership organizations to determine whether a protectable intimate association right is present. *Id.* at 546, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 485; *see also Roberts, supra,* 468 *U.S.* at 620, 104 *S.Ct.* at 3251, 82 *L.Ed.*2d at 473 (stating that "factors ... relevant [to an intimate association analysis] include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent"). As applied to Boy Scouts, we find that its large size, nonselectivity, inclusive rather than exclusive purpose,

and practice of inviting or allowing nonmembers to attend meetings, establish that the organization is not "sufficiently personal or private to warrant constitutional protection" under the freedom of intimate association.

As a preliminary matter, contrary to Boy Scouts' assertion, whether we evaluate the Boy Scout organization at the national or local troop level, the result would be the same. *See supra* at 598 n. 9, 734 *A*.2d at 1215 n. 9. Either way, Boy Scouts cannot claim the right of intimate association for its members. Because Boy Scouts' argument is necessarily stronger at the smaller troop level, we will consider the intimate association factors as applied to local troops.

Boy Scouts informs us that a typical Boy Scout troop consists of between fifteen and thirty boys and several adult leaders. In *Rotary Club*, the Supreme Court specifically held that a local club with as few as twenty members did not qualify as "the kind of intimate or private relation that warrants constitutional protection." 481 *U.S.* at 546, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 484–85. Moreover, Boy Scout troops are unselective in their membership. *See supra* at 599–602, 734 *A*.2d at 1216–17. Any boy between the ages of eleven and seventeen can join; indeed, Boy Scouts has quite clearly said that "any boy" is welcome. *See id.* at 601, 734 *A*.2d at 1217. Boy Scouts also has not set an upper limit on the number of boys who can join, but instead, actively seeks to interest as many boys as possible through advertising and other outreach methods. *See id.* at 590, 734 *A*.2d at 1211. Even if Boy Scouts is more selective in choosing its leaders, leaders do not substitute for the boys' parents, *see id.* at 602–03, 734 *A*.2d at 1218; nor do they have private or intimate relationships with troop members. Relationships within the troop are simply not the "kind of ... personal relationship[s] to which [the Supreme Court has] accorded protection under the First Amendment." *Rotary Club, supra*, 481 *U.S.* at 547, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 485.

Boy Scouts' inclusive purpose deserves further discussion in this context. Like the Rotary Clubs analyzed by the Supreme Court, the purpose of Boy Scouts "is to produce inclusive, not exclusive membership." *Id.* at 546, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 485. Boy Scouts has made a commitment to ensure that its membership is "representative of all of the population." *See supra* at 598, 734 *A.*2d at 1215. "Such an inclusive fellowship ... based on diversity of interest, however beneficial to the members" is also not indicative of a protectable form of intimate association. *Rotary Club, supra,* 481 *U.S.* at 546–47, 107 *S.Ct.* at 1946, 95 *L.Ed.*2d at 485.

Boy Scouts' practice of inviting or allowing nonmembers to attend certain troop meetings further persuades us that Boy Scouts cannot claim the right of intimate association. In *Rotary Club,* the Supreme Court observed that "[m]any of the Rotary Clubs' central activities [were] carried on in the presence of strangers .... [and that] clubs [were] encouraged to seek coverage of their meetings and activities in local newspapers." *Id.* at 547, 107 *S.Ct.* at 1946–47, 95 *L.Ed.*2d at 485. In the Court's view, this negated Rotary International's claim that the California Civil Rights Act "interfere[d] unduly with the members' freedom of private association." *Id.* at 547, 107 *S.Ct.* at 1947, 95 *L.Ed.*2d at 485. Likewise, Boy Scouts' practice of inviting nonmembers to "School Nights" and other similar activities undermines its intimate association claim. *See supra* at 572, 734 *A.*2d at 1201.

We conclude that Boy Scouts has not demonstrated a protectable intimate association right under the First Amendment.

### B. *Freedom of Expressive Association*

"An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts, supra,* 468 *U.S.* at 622, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 474. Thus, "the right to engage in

activities protected by the First Amendment [carries with it] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Ibid.* The freedom to come together in furtherance of a "collective" purpose provides protection for minority views, thereby fostering "political and cultural diversity." *Ibid.*

When the government attempts "to interfere with the internal organization or affairs of the group," *id.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 474, the members' freedom of expressive association may be curtailed. In this regard, the Supreme Court has said that "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Id.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 474–75. This does not mean, however, "that in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution." *New York State Club Ass'n v. City of New York,* 487 *U.S.* 1, 13, 108 *S.Ct.* 2225, 2234, 101 *L.Ed.*2d 1, 16 (1988). Rather, the Court has found that a group member infringes upon an organization's freedom of expressive association only if he or she "affect[s] 'in any significant way' the [other members'] ability ... to ... advocate public or private viewpoints." *Ibid.; see also Rotary Club, supra,* 481 *U.S.* at 548, 107 *S.Ct.* at 1947, 95 *L.Ed.*2d at 486 (holding that "the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes"); *Roberts, supra,* 468 *U.S.* at 626–27, 104 *S.Ct.* at 3254, 82 *L.Ed.*2d at 477 (ruling that "the Jaycees has failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association" because "[t]here is ... no basis in the record for concluding that admission of women ... will impede the organization's ability to engage in these protected activities or to disseminate its preferred views").

Moreover, "[t]he right to associate for expressive purposes is not ... absolute." *Roberts, supra,* 468 *U.S.* at 623, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 475. The Supreme Court has held that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedom." *Ibid.* State laws against discrimination may take precedence over the right of expressive association because "acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit." *Id.* at 628, 104 *S.Ct.* at 3255, 82 *L.Ed.*2d at 478. The right of expressive association must, therefore, be weighed against this compelling interest in each case.

We find that the LAD does not violate Boy Scouts' freedom of expressive association because the statute does not have a significant impact on Boy Scout members' ability to associate with one another in pursuit of shared views. The organization's ability to disseminate its message is not significantly affected by Dale's inclusion because: Boy Scout members do not associate for the purpose of disseminating the belief that homosexuality is immoral; Boy Scouts discourages its leaders from disseminating *any* views on sexual issues; and Boy Scouts includes sponsors and members who subscribe to different views in respect of homosexuality.

Boy Scouts claims that its members' views regarding homosexuality are evident from its Scout Law and Oath, which embody general moral principles. The Scout Law requires Boy Scout members to be "trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent," whereas the Oath requires each scout to promise: "I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight." Boy Scouts as-

serts that it teaches those moral principles to its members through scouting activities. BSA Bylaws require that "in all activities, emphasis [is to] be placed upon practice in daily life of the principles of the Scout Oath." Boy Scouts aims to foster "strength, confidence, and good judgment" by providing boys with "a world full of exciting adventures" and the opportunity "to go places and do things." *Boy Scout Handbook, supra,* at vii. In the words of the Chief Scout Executive:

> As a Scout, you'll hike and camp, learn how to live in the out-of-doors, and discover many ways to care for the land. You can cook your meals over a camp stove and identify all kinds of plants and animals that are part of our environment. No matter what happens, you'll know how to take care of yourself. You'll develop strength, confidence, and good judgment. And you can find out how it feels to be a leader.
>
> [*Ibid.*]

We agree that Boy Scouts expresses a belief in moral values and uses its activities to encourage the moral development of its members. *Cf. Roberts, supra,* 468 *U.S.* at 636, 104 *S.Ct.* at 3259–60, 82 *L.Ed.*2d at 483–84, (O'Connor, J., concurring in part and concurring in judgment) (stating "protected expression may also take the form of quiet persuasion, inculcation of traditional values, instruction of the young, and community service .... [and e]ven the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement"). We are not persuaded, however, that a "shared goal[ ]" of Boy Scout members is to associate in order to preserve the view that homosexuality is immoral. *See id.* at 622, 104 *S.Ct.* at 3252, 82 *L.Ed.*2d at 474 (recognizing that freedom of expressive association protects an association's "collective effort on behalf of shared goals").

Boy Scouts argues that the words "morally straight" and "clean" in the Scout Oath and Law explicitly or implicitly stand for the proposition that homosexuality is immoral.[12] In support of its

---

[12] Boy Scouts also points to a 1978 position paper in support of its argument that it associates for the expressive purpose of advocating the immorality of

position, Boy Scouts relies on the *Boy Scout Handbook* definition of "morally straight" and "clean":

### Morally Straight

To be a person of strong character, guide your life with honesty, purity, and justice. Respect and defend the rights of all people. Your relationships with others should be honest and open. Be clean in your speech and actions, and faithful in your religious beliefs. The values you follow as a Scout will help you become virtuous and self-reliant.

### Clean

A Scout is CLEAN. A Scout keeps his body and mind fit and clean. He chooses the company of those who live by these same ideals. He helps keep his home and community clean.

You never need to be ashamed of dirt that will wash off. . . .

There's another kind of dirt that won't come off by washing. It is the kind that shows up in foul language and harmful thoughts.

Swear words, profanity, and dirty stories are weapons that ridicule other people and hurt their feelings. The same is true of racial slurs and jokes making fun of ethnic groups or people with physical or mental limitations. A Scout knows there is no kindness or honor in such mean-spirited behavior. He avoids it in his own words and deeds. He defends those who are the targets of insults.

The words "morally straight" and "clean" do not, on their face, express anything about sexuality, much less that homosexuality, in particular, is immoral. We doubt that young boys would ascribe any meaning to these terms other than a commitment to be good.

Boy Scouts also argues that the immorality of homosexuality can be implied from the moral principles expressed by the Scout Oath and Law. Yet, Boy Scouts teaches that "moral fitness" is an individual choice and defers the ultimate definition to its members:

Morality . . . concerns the "principles of right and wrong" in our behavior, and "what is sanctioned by *our* conscience or ethical judgment." . . .

---

homosexuality. *See supra* at 579 n. 4, 734 A.2d at 1205 n. 4. We observe that the position paper was not disseminated to Boy Scout members, and decline, therefore, to view it as representative of the members' shared views.

In addition, Boy Scouts refers to four other position papers, all written after Dale's expulsion. The self-serving nature of these papers is apparent.

> In any consideration of moral fitness, a key word has to be "courage." A boy's courage to do what *his* head and *his* heart tell him is right. And the courage to refuse to do what *his* heart and *his* head say is wrong.
>
> [*Scoutmaster Handbook, supra,* at 71 (emphasis added).]

The *Boy Scout Handbook, supra,* at 551, also acknowledges that a member's concept of morality is intertwined with his "religious beliefs." The record in this case reveals that Boy Scouts' religious sponsors differ in their views about homosexuality.[13] *Compare* Brief of *Amici Curiae* National Catholic Committee on Scouting et al. at 1 (declaring that Boy Scouts' admission of practicing homosexuals would affect some church sponsors' ability "to advance core moral values, arising from sincere well established religious beliefs") *with* Brief of *Amici Curiae* The Diocesan Council of the Episcopal Diocese of Newark, et al. at 1 (stating that "the teachings of the Episcopal Church ... affirm[ ] the rights of lesbians and gay men to the equal protection of the laws and to live free from discrimination based upon affectional or sexual orientation"). On the record before us, it appears that no single view on this subject functions as a unifying associational goal of the organization.

We hold, therefore, that Dale's membership does not violate Boy Scouts' right of expressive association because his inclusion would not "affect in any significant way [Boy Scouts] existing members' ability to carry out their various purposes." *Rotary Club, supra,* 481 *U.S.* at 548, 107 *S.Ct.* at 1947, 95 *L.Ed.*2d at 486.

That Boy Scout members do not associate to share the view that homosexuality is immoral suggests that Dale's expulsion constituted discrimination based solely on his status as an openly gay man. The United States Supreme Court has not hesitated to uphold the enforcement of a state's antidiscrimination statute against an expressive association claim based on assumptions in respect of status that are not a part of the group members' shared expressive purpose. *See Roberts, supra,* 468 *U.S.* at 628, 104 *S.Ct.* at

---

[13] We note in passing that Boy Scouts has renewed the charters of sponsors whose positions differ from that alleged by Boy Scouts.

3255, 82 *L.Ed.*2d at 478 ("[W]e decline to indulge in the sexual stereotyping that underlies appellee's contention that, by allowing women to vote, application of the Minnesota Act will change the content or impact of the organization's speech."); *see also New York State Club Ass'n, supra,* 487 *U.S.* at 13, 108 *S.Ct.* at 2234, 101 *L.Ed.*2d at 16 (upholding antidiscrimination law that "merely prevents an association from using . . . specified characteristics as shorthand measures in place of what the city considers to be more legitimate criteria for determining membership").

Boy Scouts submits that it expelled Dale because he "was pictured and written-up in the *Star–Ledger* as Co–President of the Rutgers University and Gay Alliance." *See supra* at 578, 734 *A.*2d at 1205. In the article, Dale states that he is gay. He does not identify himself as a Boy Scout leader or member, nor does he express an opinion about any of Boys Scouts' policies, or suggest that Boy Scouts should allow him openly to advocate acceptance of homosexuality.[14] Indeed, Dale has stated that he accepts and endorses Boy Scouts' moral principles. In Dale's words:

> Scouting appealed to me for many reasons. . . . I admired the purposes for which BSA stands—teaching young people outdoor and camping skills, developing their leadership abilities and sense of community responsibility, and providing them with the tools to make moral choices over the course of their lives.
>
> As a Scout, I promised to live by the Scout Oath. . . . I believed that the Scout Oath stood for my commitment to live an honorable life, to set high standards for myself, and to do my best to serve others. In my more than twelve years as a member of BSA, I strove never to do anything inconsistent with the values embodied in the Scout Oath. . . .
>
> . . . I understood the Scout Oath to represent the high ideals Scouting encouraged each of its members to achieve. In all my years in Scouting, I always tried to live in accordance with the Scout Law and to adhere to the values embodied in it.

---

[14] Boy Scouts argues that Dale's recent public statements about the policy of excluding avowed homosexuals indicate that he has a "moral viewpoint in opposition to that of Boy Scouts and [has] expressed that viewpoint to all who will listen." We have no evidence, however, that when Dale refers to this "policy," he is talking about anything other than the decision to expel him because of his status as co-president of the Rutgers University Lesbian/Gay Alliance.

> As I grew ... older, my commitment to Scouting deepened. Scouting ... taught me how to deal with the ethical choices I encountered as a teenager.

Nonetheless, despite Dale's commitment, he was expelled from Boy Scouts shortly after the article was published.

The original termination letter Dale received indicates that Dale was expelled because of his status and not because his membership conflicted with Boy Scouts' message. In it, Boy Scouts told Dale he was being terminated because of his sexual orientation: "The grounds for this membership revocation are the standards for leadership established by Boy Scouts of America, which specifically forbid membership to homosexuals." In subsequent letters, Boy Scouts attempted to connect Dale's termination with his "avowed" homosexuality and Boy Scouts' "policy [to] exclud[e] adults whose views of the morality of homosexual conduct differ from the views held by Boy Scouts of America." Those subsequent letters suggest that Boy Scouts perceived Dale's membership as interfering with its views on "the morality of homosexual conduct"; they do not alter Boy Scouts' original statement. The original termination letter expresses Boys Scouts' real concern: Dale's status as a homosexual.

Perhaps more revealing is the contradiction between Boy Scouts' current litigation posture on homosexual members and the organization's general philosophy on open membership. Boy Scouts has been firmly committed to a diverse and "representative" membership. It recognizes that the skills it teaches its members are needed "in all economic, cultural, and ethnic groups." *A Representative Membership, supra*, at 2. Its objective is to see to it "that all eligible youth have the opportunity to affiliate with the Boy Scouts of America." *Id.* at 1. As we observed earlier, consistent with this position, Boy Scouts does not seek to limit membership to individuals of a particular religious faith or moral persuasion. *See supra* at 575, 599, 734 *A*.2d at 1203, 1216. The result of this "all-inclusive" membership policy is the admission of four million boys and over one million adults. *See id.* at 598, 734 *A*.2d at 1215.

When contrasted with its "all-inclusive" policy, Boy Scouts' litigation stance on homosexuality appears antithetical to the organization's goals and philosophy. The exclusion of members solely on the basis of their sexual orientation is inconsistent with Boy Scouts' commitment to a diverse and "representative" membership. Moreover, this exclusionary practice contradicts Boy Scouts' overarching objective to reach "all eligible youth." We are satisfied that Boy Scouts' expulsion of Dale is based on little more than prejudice and not on a unified Boy Scout position; in other words, Dale's expulsion is not justified by the need to preserve the organization's expressive rights.

The invocation of stereotypes to justify discrimination is all too familiar. Indeed, the story of discrimination is the story of stereotypes that limit the potential of men, women, and children who belong to excluded groups. By way of example, we observe that certain claimed propensities of character were once invoked to advocate the subjugation of women. *United States v. Virginia* recites the prevailing view of women at the time of the writing of the Constitution: " 'Were our State a pure democracy ... there would yet be excluded from [our] deliberations ... women, who, to prevent depravation of morals and ambiguity of issue, should not mix promiscuously in the public meetings of men.' " 518 *U.S.* 515, 531 n. 5, 116 *S.Ct.* 2264, 2275 n. 5, 135 *L.Ed.*2d 735, 750 n. 5 (1996) (quoting Letter from Thomas Jefferson to Samuel Kercheval (Sept. 5, 1816)). Less than a century later, the exclusion of women from the Illinois State Bar was thought to be justified because

[t]he natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and function of womanhood. The harmony, not to say identity, of interests and views which belong to the family institution, is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband.

[*Bradwell v. Illinois,* 83 *U.S.* (16 *Wall.*) 130, 141, 21 *L.Ed.* 442, 446 (1873) (Bradley, J., concurring).]

*See also J.E.B. v. Alabama,* 511 *U.S.* 127, 132, 114 *S.Ct.* 1419, 1423, 128 *L.Ed.*2d 89, 99 (1994) (noting that women were traditionally kept from jury duty because they "were thought to be too fragile and virginal to withstand the polluted courtroom atmosphere").

The sad truth is that excluded groups and individuals have been prevented from full participation in the social, economic, and political life of our country.[15] The human price of this bigotry has been enormous. At a most fundamental level, adherence to the principle of equality demands that our legal system protect the victims of invidious discrimination.

New Jersey has long been a leader in this effort. *See, e.g., Peper, supra,* 77 *N.J.* at 80, 389 *A.*2d 465 (stating that "New Jersey has always been in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society"). In 1945, the New Jersey Legislature codified its commitment to equality by enacting the LAD, "some twenty years before the effective date of Title VII." *Ibid.; see* 42 *U.S.C.A.* §§ 2000a–2000h–6. The Legislature found that "because of discrimination, people suffer personal hardships, and the State suffers a grievous harm." *N.J.S.A.* 10:5–3. In specific, the Legislature determined that victims of discrimination suffer

economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems.

[*Ibid.*]

It is unquestionably a compelling interest of this State to eliminate the destructive consequences of discrimination from our society.

---

[15] The LAD prohibits discrimination on the basis of "race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, or sex. . . ." *N.J.S.A.* 10:5–4. The scope of the statute is reflective of the breadth of the underlying problems we face as a society.

In 1991, the Legislature amended the LAD, *L.* 1991, *c.* 519, § 2, to add "affectional or sexual orientation" to the list of protected classes. This amendment extends New Jersey's historical commitment to the eradication of discrimination to that group of individuals who face discrimination because of sexual orientation. As the Appellate Division stated:

> By amendment to *N.J.S.A.* 10:5–4 in 1991 (*L.* 1991, *c.* 519, § 2), the Legislature expanded the categories of persons protected to include discrimination based on "affectional or sexual orientation." This was an implicit recognition that discrimination based on "archaic" and "stereotypical notions" about homosexuals that bears no relationship to reality cannot be countenanced. *Roberts, supra,* 468 *U.S.* at 625, 104 *S.Ct.* at 3253, 82 *L.Ed.*2d at 476. It is also a recognition that the "stigmatizing injury" and denial of equal opportunities that accompanies it is felt no less strongly by this protected group than others who suffer personal hardship because of discriminatory practice. *Ibid.*
>
> [*Dale, supra,* 308 *N.J.Super.* at 549, 706 *A.*2d 270.]

With the amendment of the LAD, the Legislature declared that discrimination in places of public accommodation on the basis of "affectional or sexual orientation ... [is] a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." *N.J.S.A.* 10:5–3. Our courts have recognized the arbitrariness of discriminating against individuals solely because of their sexual orientation. *See, e.g., One Eleven Wines & Liquors, Inc. v. Division of Alcoholic Beverage Control,* 50 *N.J.* 329, 340–41, 235 *A.*2d 12 (1967) (rejecting argument that permitting "apparent homosexuals" to congregate at bar threatens public welfare); *Poff, supra,* 228 *N.J.Super.* at 381, 549 *A.*2d 900 (stating that "refus[al] to extend ... [LAD's] protection to homosexuals because they may be more susceptible to a dread disease would mark a return to a past of judging individuals on the basis of ignorance and prejudice"); *In re J.S. & C.,* 129 *N.J.Super.* 486, 489, 324 *A.*2d 90 (Ch.Div.1974) (stating that "[f]undamental rights of parents may not be denied, limited or restricted on the basis of sexual orientation, *per se* "), *aff'd,* 142 *N.J.Super.* 499, 362 *A.*2d 54 (App.Div.1976).

■ A purpose of the LAD is to eliminate sexual orientation discrimination. The statute effectuates this purpose without regard to an organization's viewpoint, "the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services." *Hurley, supra,* 515 *U.S.* at 572, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503 (recognizing that such laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination"); *see also Rotary Club, supra,* 481 *U.S.* at 549, 107 *S.Ct.* at 1948, 95 *L.Ed.*2d at 487 (upholding Minnesota public accommodations law that made "no distinctions on the basis of the organization's viewpoint"). Like other similar statutes, the LAD serves a compelling state interest and "abridges no more speech or associational freedom than is necessary to accomplish that purpose." *Roberts, supra,* 468 *U.S.* at 629, 104 *S.Ct.* at 3255, 82 *L.Ed.*2d at 478. Thus, even if Dale's membership " 'work[s] some slight infringement on ... [Boy Scouts'] members' right of expressive association," we find that the "infringement is justified because it serves ... [New Jersey's] compelling interest in eliminating discrimination" based on sexual orientation. *Rotary Club, supra,* 481 *U.S.* at 549, 107 *S.Ct.* at 1948, 95 *L.Ed.*2d at 486.

Boy Scouts is an American institution committed to bringing a diverse group of young boys and men together—wealthy and underprivileged, urban and rural, from different cultures and from different religions—to play and to learn. Boy Scouts' activities are designed to build character and instill moral principles. Nothing before us, however, suggests that one of Boy Scouts' purposes is to promote the view that homosexuality is immoral. Accordingly, application of the LAD does not infringe upon Boy Scouts' right of expressive association.

### C. *Freedom of Speech*

■ Boy Scouts relies on *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston* in support of its alleged

First Amendment right to exclude Dale. In *Hurley*, GLIB, an organization comprised of gay, lesbian, and bisexual descendants of Irish immigrants, applied for permission to march in the St. Patrick's Day–Evacuation Day Parade. 515 *U.S.* at 561, 115 *S.Ct.* at 2341, 132 *L. Ed.*2d at 496. GLIB was formed for the sole purpose of marching in the parade, "to express pride in [the members'] Irish heritage as openly gay, lesbian, and bisexual individuals, to demonstrate that there are such men and women among those so descended, and to express . . . solidarity with like individuals who sought to march in New York's St. Patrick's Day Parade." *Ibid.* The private parade organizers, the South Boston Allied War Veterans Council, refused to allow GLIB to march, and the group brought suit alleging that the Council's actions violated the state's public accommodations law. *Ibid.*

The *Hurley* Court held that inclusion of the group in the parade would violate the Council's First Amendment rights. The Court observed that the state public accommodations statute had "been applied in a peculiar way," because "[i]ts enforcement [did] not address any dispute about the participation of openly gay, lesbian, or bisexual individuals in various units admitted to the parade . . . . [but rather] the admission of GLIB as its own parade unit carrying its own banner." *Id.* at 572, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503. The Court explained that forcing the Council to include GLIB would "essentially requir[e] [the members] to alter the expressive content of their parade," *id.* at 572–73, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503, because "in the context of an expressive parade, as with a protest march, the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole," *id.* at 577, 115 *S.Ct.* at 2349, 132 *L.Ed.*2d at 506. Application of the statute in that context was held to "violate[ ] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503. Indeed, application of the statute "had the effect of declaring the sponsors' speech itself to be the public accommodation." *Ibid.*

We find the facts of *Hurley* distinguishable. Dale's status as a scout leader is not equivalent to a group marching in a parade. Dale does not come to Boy Scout meetings "carrying a banner." Dale has never used his leadership position or membership to promote homosexuality, or any message inconsistent with Boy Scouts' policies. *Cf. Curran v. Mount Diablo Council of the Boy Scouts of Am.,* 17 *Cal.*4th 670, 72 *Cal.Rptr.*2d 410, 952 *P.*2d 218, 253 (1998) (Kennard, J., concurring) (proclaiming that Boys Scouts would have valid First Amendment defense if California's antidiscrimination law applied because Curran sought "membership in order to promote . . . [his] views"). Additionally, there is no indication that Dale intends to actively "teach" anything whatsoever about homosexuality as a scout leader, or that he will do other than Boy Scouts instructs him to do—refer boys to their parents on matters of religion and sex.

██ Nor is Boy Scout leadership a form of "pure speech" akin to a parade. As the *Hurley* Court explained, "the word 'parade' [is used] to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way." 515 *U.S.* at 568, 115 *S.Ct.* at 2345, 132 *L.Ed.*2d at 500. Unlike a marcher in a parade, Dale does not participate in Boy Scouts "to make a point" about sexuality, but rather because of his respect for and belief in the organization. And unlike a parade, where the "speech itself . . . [is] the public accommodation," *id.* at 573, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503, permitting Dale to remain in a leadership position in no way prevents Boy Scouts from "invok[ing] its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another," *id.* at 574, 115 *S.Ct.* at 2348, 132 *L.Ed.*2d at 504. We reject the notion that Dale's presence in the organization is symbolic of Boy Scouts' endorsement of homosexuality. On these facts, we do not find forced speech. *See id.* at 573, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503 (declaring that right to free speech includes right to "decide 'what not to say' ") (*quoting Pacific Gas*

& *Electric Co. v. Public Utilities Comm'n,* 475 *U.S.* 1, 16, 106 *S.Ct.* 903, 912, 89 *L.Ed.*2d 1, 12 (1986)).

In short, the reinstatement of Dale does not compel Boy Scouts to express any message. To recognize Boy Scouts' First Amendment claim would be tantamount to tolerating the expulsion of an individual solely because of his status as a homosexual—an act of discrimination unprotected by the First Amendment freedom of speech.

## V

## *CONCLUSION*

Today, we hold that Boy Scouts is a "place of public accommodation" and is, therefore, subject to the provisions of the LAD. As a "place of public accommodation" it cannot deny any person "accommodations, advantages, facilities, and privileges ... because of ... sexual orientation." *N.J.S.A.* 10:5–4. For the reasons set forth in this opinion, application of the LAD does not infringe on Boy Scouts' First Amendment rights.

The judgment of the Appellate Division is affirmed. We remand to the Chancery Division for further proceedings consistent with this opinion.

HANDLER, J., concurring.

I join the Court in holding that the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, prohibits the Boy Scouts of America (BSA) and the Monmouth Council of the Boy Scouts of America (collectively, Boy Scouts), as places of public accommodation, from expelling a member based solely on his sexual orientation. I fully endorse the Court's reasoning in reaching that result. I further emphasize, in the context of this case, the significance of the role of "genuine membership selectivity" as a material factor in the characterization of a place of accommodation as "public."

This case also pits an individual's right to be protected under the LAD from discrimination based on his sexual orientation against the First Amendment expressional rights of a public accommodation. In resolving that conflict, we must consider the significance of the connection between the individual's speech and his identity when both relate to his sexual orientation.

## I

On July 19, 1990, soon after learning that highly decorated Eagle Scout James Dale was gay, Boy Scouts revoked Dale's membership privileges and requested that he sever all relations with the organization. After Dale inquired about the basis for his expulsion, he was first informed that Boy Scouts "forbid[s] membership to homosexuals," and later that "[BSA] does not admit avowed homosexuals to membership in the organization." *Ante* at 579, 734 *A*.2d at 1205. Dale thereafter commenced this lawsuit, charging Boy Scouts with violations of the LAD. Dale specifically contended that Boy Scouts, as a place of public accommodation, illegally expelled him based on his "affectional or sexual orientation," contrary to *N.J.S.A.* 10:5–4.

## A.

The critical question in deciding whether Boy Scouts violated the LAD by terminating Dale's membership, as the Court recognizes, is whether Boy Scouts may be deemed.a "place of public accommodation." *Ante* at 585, 734 *A*.2d at 1208. The Court observes that the term "place" in the LAD is not limited to a single geographic situs and, therefore, a fixed location is not a prerequisite to satisfying its definition. *Id.* at 589, 734 *A*.2d at 1210. A "place" encompasses any location or facility at which an organization undertakes its activities. Boy Scouts, the Court determines, as an organization that performs its functions at numerous locales, is clearly a "place" under the LAD. *Id.* at 589, 734 *A*.2d at 1213. We also conclude that Boy Scouts is an "accommodation" for purposes of the LAD, especially given its

uniquely educational and recreational nature. *Id.* at 594, 734 *A.*2d at 1213. Further, Boy Scouts is sufficiently "public" to be covered by the LAD. *Id.* at 591–92, 734 *A.*2d at 1211–12. If an organization either expressly or impliedly engages in broad public solicitation, it is considered "public" for purposes of the LAD. *Id.* at 589, 734 *A.*2d at 1210–11. Because Boy Scouts extends general membership invitations through such media as national broadcast and print advertising, public service announcements, recruiting drives and materials, as well as through the unique symbol of the scout uniform, Boy Scouts qualifies as "public." *Id.* at 590–91, 734 *A.*2d at 1211. In addition, Boy Scouts' close relationship with other established public accommodations lends it a "public" character. *Id.* at 591–93, 734 *A.*2d at 1211–13. I fully agree that these characteristics are sufficient to justify the Court's conclusion that Boy Scouts meets the LAD's definition of "place of public accommodation."

### B.

A closely related organizational characteristic, "genuine selectivity," also bears on the "place of public accommodation" analysis. The absence of any genuine criteria for membership selectivity reinforces the "public" nature of an organization.

Membership selectivity, as the Court stresses, is a critically important factor in determining whether an organization is "distinctly private" pursuant to *N.J.S.A.* 10:5–5*l*, and therefore exempt from the LAD's proscriptions applicable to an entity that is otherwise a "place of public accommodation." *See ante* at 596, 734 *A.*2d at 1214 (noting that "selectivity issue [is] the principal determinant of 'distinctly private' status"). Membership selectivity is equally relevant to whether an organization may be initially considered to be a "place of public accommodation." *See id.* at 597, 734 *A.*2d at 1214 (recognizing that absence of membership selectivity "weigh[s] in the public accommodation calculus"). The reason for this confluence is that the "distinctly private" exception

is the "other side of the 'public accommodation' coin." *Kiwanis Int'l v. Ridgewood Kiwanis Club,* 806 *F.*2d 468, 476 (3d Cir.1986), *reh'g denied,* 811 *F.*2d 247 (1987). Realistically, and in most contexts, one characteristic cannot exist without negating the other:

> [I]f an organization "is not a 'place of public accommodation' because of its selective membership practices, it must be private as that term is used in the statute." In contrast, if an organization qualifies as a "place of public accommodation" ... the "private" club exception ... does not apply.
>
> [*Brounstein v. American Cat Fanciers Ass'n,* 839 *F.Supp.* 1100, 1106 (D.N.J. 1993) (citation omitted).]

Thus, the selectivity that we require to meet the LAD's "distinctly private" exception also bears on the initial determination of whether a place of accommodation should be characterized as "public." As the Third Circuit Court of Appeals has observed, "unselectivity, unrestrictedness, and open invitation" are critical determinants of whether an organization is a "place of public accommodation." *Kiwanis, supra,* 806 *F.*2d at 476.[1] Of these three, selectivity has been described as the "touchstone of the determination of whether a membership organization is a 'place of public accommodation'." *Brounstein, supra,* 839 *F.Supp.* at 1106.

The focus of that investigation—as the Court requires in the context of our "distinctly private" exception analysis, *ante* at 599, 734 *A.*2d at 1216—must be selectivity in practice, *i.e.,* "genuine selectivity." "The genuine selectivity of the membership process is the most important factor in ascertaining private club status." *United States v. Lansdowne Swim Club,* 713 *F.Supp.* 785, 797

---

[1] The *Kiwanis* court correctly identified the relevance of "unselectivity, unrestrictedness and open invitation" to the identification of a "place of public accommodation." It overstated those factors, however, as comprising the "test" for satisfying that definition. *Kiwanis, supra,* 806 *F.*2d at 476. If an organization possesses those characteristics, it will certainly qualify as a "place of public accommodation." Nevertheless, the absence or mere partial satisfaction of one or more of those factors does not preclude a finding that an organization is a "place of public accommodation." *See infra* at 631–33, 734 *A.*2d at 1233–34; *Kiwanis, supra,* 811 *F.*2d 247 (Gibbons, J., dissenting from sur denial of rehearing) (criticizing *Kiwanis* for suggesting that all associations that are not completely open, unselective and unrestrictive are not "public").

(E.D.Pa.1989), *aff'd*, 894 *F.*2d 83 (3d Cir.1990); *accord United States v. Trustees of the Fraternal Order of Eagles*, 472 *F.Supp.* 1174, 1175–76 (E.D.Wis.1979) (observing that "most important factor" in determining whether club is private and thus not public accommodation subject to Civil Rights Act, is "process which the club actually uses in selecting its members"). The United States Supreme Court has recognized genuine selectivity as an integral characteristic of a private club. *See Tillman v. Wheaton–Haven Recreation Ass'n*, 410 *U.S.* 431, 438, 93 *S.Ct.* 1090, 1094, 35 *L.Ed.*2d 403, 409–10 (1973). The absence of genuine selectivity in membership decisions constitutes persuasive evidence of the public nature of an organization.

1.

A number of features reflect a club's genuine selectivity in membership practices:

> [T]he substantiality of the membership fee; the numerical limit on club membership (apart from the capacity of the facilities); the membership's control over the selection of new members; the formality of the club's admission procedures; the standards or criteria for admission; and whether and how many [ ] applicants have been denied membership relative to the total number of [ ] applicants.
>
> [*Lansdowne Swim Club, supra,* 713 *F.Supp.* at 797 (citations omitted).]

The hallmark of genuine selectivity is that the organization actually uses its stated selection criteria to limit its membership in accordance with those criteria.

The Court's holding that a showing of genuine selectivity is required to satisfy the "distinctly private" exception in the LAD, *ante* at 599, 734 *A.*2d at 1216 (rejecting application of "distinctly private" exception to Boy Scouts because "[w]e do not find [ ] that the Oath and Law operate as genuine selectivity criteria"), is consistent with our existing LAD jurisprudence. In *Clover Hill Swimming Club v. Goldsboro*, 47 *N.J.* 25, 219 *A.*2d 161 (1966), both a sign at a swimming club's entrance and the club's promotional literature referred to itself as a "private" facility. *Id.* at 34, 219 *A.*2d 161. The literature further stated that "all applications would be subject to approval by club officials." *Ibid.* The Court held that such "[s]elf-serving declarations by the owner of

an accommodation are not determinative of its character." *Ibid.* The relevant inquiry was whether in practice the club had exercised any actual discretion in its selection of new members.

Other courts have likewise recognized that selectivity in practice is integral to the determination of whether an organization is private and thus exempt from antidiscrimination laws. For example, in *Lansdowne Swim Club, supra,* the Third Circuit relied on principles of genuine selectivity in assessing whether a swimming club, charged with racial discrimination, qualified as a private club, thus exempting it from Title II of the Civil Rights Act of 1964. 894 *F.*2d at 85–86. The court pointed out that although the club required an interview for membership, it was "not probing, having the sole purposes of describing the club and its membership procedures and verifying the names and ages of children in the applicant's family," and that the club undertook virtually no other investigation of an applicant's background. *Id.* at 86 n. 4. The court reasoned that "formal membership requirements 'have little meaning when in fact the club does not follow a selective membership policy.'" *Id.* at 86 (quoting *Wright v. Salisbury Club, Ltd.,* 632 *F.*2d 309, 312 (4th Cir.1980) (citing *Tillman, supra,* 410 *U.S.* at 438–39, 93 *S.Ct.* at 1094–95, 35 *L. Ed.*2d at 409–10)). The court further noted that evidence of only a few instances of applicant rejections by the club was probative of a lack of genuine selectivity. *Ibid.*

In *Fraternal Order of Eagles, supra,* the defendant claimed private club status based on an elaborate set of requirements codified in its statutes:

> Those statutes ... include[d] the following requirements: (1) "[e]very applicant for membership in any Local Aerie shall be recommended by two members of the Order"; (2) "[n]o person shall be eligible to be elected to membership in any Local Aerie unless such person is a male, is of good moral character, and believes in the existence of a Supreme Being, ..."; (3) "[n]o application for membership shall be considered if the applicant shall not reside within the jurisdiction of the Aerie to which such application is submitted"; (4) "[e]ach person desiring to become a member of an Aerie must properly fill out and sign an application. .;" (5) "[a]ll applications for membership ... shall be referred to the Investigating Committee"; and (6) "[a]fter the report of the Investigating Committee is submitted, the

application shall be voted upon, and, if elected, the Aerie may proceed with the initiation of the applicant."

[472 *F.Supp.* at 1176.]

Despite those formal published criteria, the court rejected private status because the club's formal admissions policy "[stood] in stark contrast to the admission process that ... the Eagles Club actually uses," and showed little selectivity. *Ibid.* (noting further that club in one year turned down only three of over 1000 applicants and had 7000 to 8000 members at any one time).

A number of other cases, in considering the public versus private nature of an organization, have demanded that selectivity be actually employed in practice in accordance with formal admissions criteria. *See Nesmith v. Young Men's Christian Ass'n,* 397 *F.*2d 96, 101 (4th Cir.1968) (noting that despite "some of the trappings of a private club," including membership application, regularly recorded list of members, substantial dues, and membership cards to gain access to club facilities, "[e]xamination [ ] must go beyond these mere superficialities," and concluding that club is public establishment because almost every applicant is accepted to membership); *Rogers v. International Ass'n of Lions Clubs,* 636 *F.Supp.* 1476, 1479–80 (E.D.Mich.1986) (characterizing club as public despite formal admissions criteria—including requirements that new member have "good moral character and good reputation in his community," be sponsored by current members, complete application forms, pass background investigation, and secure Board approval—concluding that "[w]hile it is true that this application procedure has the appearance of being elaborate, formal, and structured, in reality, it is not selective and almost all men who apply are admitted to membership"); *New York v. Ocean Club, Inc.,* 602 *F.Supp.* 489, 494–96 (E.D.N.Y.1984) (concluding that uninformative application form, absence of background investigation of applicant, interview that merely informed applicant about club and its facilities without probing into applicant's background and character, and fact that no member was ever rejected, all demonstrated club was not genuinely selective, *notwithstanding formal admission criteria in club constitution and*

bylaws requiring sponsorship and Board approval); *Brown v. Loudoun Golf and Country Club, Inc.,* 573 *F.Supp.* 399, 402–03 (E.D.Va.1983) (holding that admission fee, membership ceiling, and requirements that two members sign, and Board approve, application were insufficient, without more, to show that procedures operated in practice to make club's membership practices selective).

2.

If an accommodation engages in little or no selectivity in choosing its members, this constitutes strong evidence that it is "public," and thus subject to the proscriptions of the LAD. *Accord Concord Rod and Gun Club, Inc. v. Massachusetts Comm'n Against Discrimination,* 402 *Mass.* 716, 524 *N.E.*2d 1364, 1367 (1988) (noting that "determinative factor" in characterizing organization—already stipulated by parties as being "place" and "accommodation"—as "public," and thus subject to state antidiscrimination law, is "total absence of genuine selectivity in membership").

The mere fact that there is some genuine selectivity in acceptance of members is not incompatible with "public" status. That principle is supported by the understanding and practice of the Division on Civil Rights (Division), the administrative agency that is empowered under the LAD to enforce its antidiscrimination provisions. *See Nelson v. Board of Educ.,* 148 *N.J.* 358, 364, 689 *A.*2d 1342 (1997) ("The interpretation of a statute by the administrative agency charged with its enforcement is entitled to great weight.").

The Division has held that some genuine selectivity may be rendered inconsequential when balanced with other overwhelmingly unselective membership criteria. *See Hinden v. United States Power Squadrons,* No. PO2S–105 (Div. on Civil Rights Dec. 21, 1973), *aff'd,* No. A–3104–73 (App.Div. July 18, 1975), *certif. denied,* 69 *N.J.* 382, 354 *A.*2d 310 (1975), *cert. denied,* 426 *U.S.* 943, 96 *S.Ct.* 3160, 49 *L.Ed.*2d 1180 (1976). In *Hinden,* the Division held that the Power Squadrons, a national boating organization that

had local chapters in New Jersey, was a public accommodation operating in violation of the LAD because it refused admission to women. The Power Squadrons exhibited some genuine selectivity in the selection of new members, requiring the successful completion of a basic piloting course as a prerequisite for admission. The Division, however, recognized that the piloting course was itself a public accommodation because it was open to all members of the public free of charge, and regardless of sex or any other limitation. *Hinden, supra*, No. PO2S–105, slip op. at 2 (incorporating Sylvia B. Pressler, hearing examiner (now Presiding Judge, Appellate Division), *Findings of Fact and Conclusions of Law* 14 (June 1, 1973)). "Moreover, and almost without exception, every man who passe[d] the basic piloting examination [was] invited to membership," while every woman who passed was excluded. *Ibid.* The Division concluded that, despite the fact that the piloting test was used in the admissions process and was a genuine criterion in that a passing grade was required, on balance the Power Squadrons's "membership invitation [was] basically as publicly oriented as [was] the public piloting course itself." *Ibid.*

Additionally, other factors, traditionally relied upon in the determination of whether a place of accommodation is "public," may outweigh the presence of genuine selectivity in ultimately finding that an organization is subject to the LAD. *See ante* at 589, 734 *A.*2d at 1210 (noting that broad public solicitation, maintenance of close relationships with government or other public accommodations, or similarity to enumerated or previously recognized public accommodations are factors that are helpful in determining whether organization is "public accommodation"); *Frank v. Ivy Club*, 120 *N.J.* 73, 104, 576 *A.*2d 241 (1990) (holding that eating club with very selective membership criteria was public accommodation because of its "symbiotic relationship" with university, which was itself subject to LAD).

In sum, membership selectivity is relevant but may not be determinative of whether an organization meets the LAD's definition of "place of public accommodation." Such membership selec-

tivity, genuinely applied in practice, may show that a place of accommodation that is otherwise "public" satisfies the LAD's "distinctly private" exception. Conversely, the absence of genuine selectivity is always persuasive proof that an organization qualifies as "public."

3.

The reality is that Boy Scouts rarely, if ever, denies membership based on any selection criteria other than age or gender. *See ante* at 597–600, 734 *A.*2d at 1215–16. According to *A Representative Membership,* a Boy Scouts publication prepared in 1975 for BSA Executive Board members; national and local council presidents, members and staff; district committee members; and commissioners:

> *Neither the charter nor the bylaws of the Boy Scouts of America permits the exclusion of any boy.* The National Council and Executive Board have always taken the position that Scouting should be made available for *all boys who meet entrance age requirements.*
>
> [*Id.* at 2 (emphasis added).]

As a result of Boy Scouts' unselective membership criteria, the organization has more than five million youth and adult members in the United States, and over 100,000 in New Jersey.

Boy Scouts' lack of genuine selectivity is further underscored by the testimony of James William Kay, the highest ranking employee in Monmouth Council and the official who first made the decision to terminate Dale. Kay stated in deposition that he was not aware of any previous rejection by BSA's National Council of an adult application for membership in Monmouth Council. Kay was likewise unaware of any membership rejection in the previous council with which he was affiliated for eight and one-half years. Moreover, the fact that Boy Scouts does not require new members to be sponsored by a current member is further evidence that Boy Scouts does not engage in a genuine selection process. *See Kiwanis, supra,* 806 *F.*2d at 475.

The Appellate Division properly viewed Boy Scouts' "undisputed invitation for membership in its literature to 'all boys,'" as rendering its stated "'selectivity' criteria inconsequential." 308 *N.J.Su-*

*per.* 516, 538, 706 *A.*2d 270.[2] The absence of any evidence of genuine selectivity on the part of Boy Scouts compels the conclusion that Boy Scouts is "public."

## II

Boy Scouts maintains that even if it is deemed a "place of public accommodation" that is subject to the LAD, its decision to expel Dale based on his expression of his sexual orientation is protected under the First Amendment. The Court rejects that defense because Boy Scouts has failed to demonstrate a sufficiently protectable expressive interest in respect of homosexuality. *Ante* at 612–13, 734 *A.*2d at 1223.

The crux of the First Amendment analysis lies in an identification of the expressive interests of the organization and a determination of whether those interests are undermined or frustrated by the membership of the excluded person. Central to that inquiry is

---

[2] Courts and jurists of other jurisdictions have reached a similar conclusion. For example, in *Curran v. Mount Diablo Council of the Boy Scouts of America,* 17 *Cal.*4th 670, 72 *Cal.Rptr.*2d 410, 952 *P.*2d 218, 236 (1998), although the California Supreme Court held that the Boy Scouts is not the functional equivalent of "a classic 'public accommodation or amusement' " under California's common law, the court noted that "Boy Scouts is generally nonselective in its admission policies." *See also Welsh v. Boy Scouts of Am.,* 993 *F.*2d 1267, 1283 (7th Cir.) (Cummings, J., dissenting) (observing that "[m]embership [in Boy Scouts] is not selective"; "[o]ther than the mention of God in the oath, which must exclude an extremely small—though indeterminate—number of children, the only substantive requirement for membership is age, which is not so much a matter of selectivity as a basic common denominator"), *cert. denied,* 510 *U.S.* 1012, 114 *S.Ct.* 602, 126 *L.Ed.*2d 567 (1993); *Schwenk v. Boy Scouts of Am.,* 275 *Or.* 327, 551 *P.*2d 465, 473 (1976) (O'Connell, J., dissenting) ("[I]t is commonly known that membership in the Boy Scouts of America is open to any boy within the specified age group without any other limitation whatsoever."); *Merino v. San Diego County Council of the Boy Scouts of Am.,* No. 659236, slip op. at 9 (Cal.App. Dep't Super.Ct. July 7, 1994) (finding that "membership criteria for both juvenile and adult members [of Scouting] are non-selective"). *But see Welsh, supra,* 993 *F.*2d at 1276 ("Although the Scouts intentionally admit a large number of boys from diverse backgrounds, admission to membership is not without the exercise of sound discretion and judgment. This is evident from the Constitution and By-laws as well as the Boy Scouts Oath and Scout Law.").

the question of whether membership was denied based on the person's identity or status *per se*, or alternatively, on the person's expressed views. We recognize today that Boy Scouts engaged in status-based discrimination when it terminated Dale. *Id.* at 615–16, 617, 624, 734 A.2d at 1225, 1226, 1230. I fully concur in that reasoning and result. The Court's holding is especially significant because of the distinctive interdependence of expression and identity for lesbians and gay men, and the effect of that merger of speech and status on an organization's First Amendment freedom of expressive association.

## A.

A hallmark of the case law defining the contours of the right of expressive association is an identifiable demarcation between a person's status and expression. *See Board of Directors of Rotary Int'l v. Rotary Club,* 481 *U.S.* 537, 548, 107 *S.Ct.* 1940, 1947, 95 *L.Ed.*2d 474, 486 (1987) (noting that because clubs "do not take positions on 'public questions,' including political or national issues," the inclusion of women, as such, as members will not "affect in any significant way the existing members' ability to carry out their various purposes"); *see also New York State Club Ass'n v. City of New York,* 487 *U.S.* 1, 13, 108 *S.Ct.* 2225, 2234, 101 *L.Ed.*2d 1, 16 (1988) ("If a club seeks to exclude individuals who do not share the views that the club's members wish to promote, the Law erects no obstacle to this end. Instead, the Law merely prevents an association from using race, sex, and the other specified characteristics as shorthand measures in place of ... legitimate criteria for determining membership."); *Roberts v. United States Jaycees,* 468 *U.S.* 609, 627, 104 *S.Ct.* 3244, 3254, 82 *L.Ed.*2d 462, 477 (1984) (holding that law prohibiting sex discrimination was not violative of all-male organization's freedom of expressive association in part because it "imposes no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members").

The rationale for drawing a distinction between status and expression, as explained in *Roberts, supra,* is that "unsupported generalizations" and stereotypes based on a person's identity are not permissible means of ascertaining the particular views of that person:

> In claiming that women might have a different attitude about such issues as the federal budget, school prayer, voting rights, and foreign relations, or that the organization's public positions would have a different effect if the group were not "a purely young men's association," the Jaycees relies solely on unsupported generalizations about the relative interests and perspectives of men and women.... [W]e have repeatedly condemned legal decisionmaking that relies uncritically on such assumptions.... [W]e decline to indulge in the sexual stereotyping that underlies appellee's contention that, by allowing women to vote, application of the Minnesota Act will change the content or impact of the organization's speech.
>
> [468 *U.S.* at 627–28, 104 *S.Ct.* at 3255, 82 *L.Ed.*2d at 478.]

In contrast to exclusion based on status-based stereotypes, when the denial of membership is premised on actual expression, the organization can legitimately claim a basis for its assessment that the excluded person would "change the content or impact of the organization's speech." *Id.* at 628, 104 *S.Ct.* at 3255, 82 *L.Ed.*2d at 478.

Organizations may rely on their First Amendment right to exclude potential members solely on the basis of status in certain narrowly prescribed circumstances. As the United States Supreme Court has explained:

> It is conceivable, of course, that an association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion.
>
> [*New York State Club Ass'n, supra,* 487 *U.S.* at 13, 108 *S.Ct.* at 2234, 101 *L.Ed.*2d at 16.]

Thus, for example, when an organization has a unifying purpose that motivates its members to join together as an association or group, *i.e.,* a core purpose, and the inclusion of a particular person would be inconsistent or incompatible with that purpose, the expressive association rights of the organization would support the exclusion. *See Invisible Empire of the Knights of the Ku Klux Klan v. Town of Thurmont,* 700 *F.Supp.* 281, 289 (D.Md.1988)

(upholding exclusion of African American participants in political march because "group's primary purpose is to advocate one main concept—that blacks and whites should not mix. Allowing blacks to march with the KKK would change the primary message which the KKK advocates."). A "specific expressive purpose" is frequently, although not necessarily, the core or primary purpose of an organization. Such a central purpose, if compromised, would most evidently inhibit an association's ability to effectively advocate its viewpoints. The critical point is that a "specific expressive purpose" must be clear, particular, and consistent.

These considerations bear relevantly on the right of expressive association. The line between status-based and speech-based exclusion has been decisive to expressive association jurisprudence, even when that distinction was not readily apparent. In *Hurley v. Irish–American Gay, Lesbian and Bisexual Group*, 515 *U.S.* 557, 115 *S.Ct.* 2338, 132 *L.Ed.*2d 487 (1995), the Supreme Court held that GLIB, an organization of Irish lesbians and gay men, was properly excluded from marching in Boston's St. Patrick's Day parade under a banner conveying a message of Irish and lesbian and gay pride. The Supreme Court noted that it was this expression, and not the homosexual identity of the marchers themselves, that formed the petitioning parade organizers' basis for the exclusion of GLIB:

> [Petitioners do not object to] the participation of openly gay, lesbian, or bisexual individuals in various units admitted to the parade. Petitioners disclaim any intent to exclude homosexuals as such, and no individual member of GLIB claims to have been excluded from parading as a member of any group that the Council has approved to march. Instead, the disagreement goes to the admission of GLIB as its own parade unit carrying its own banner.
>
> [*Id.* at 572, 115 *S.Ct.* at 2347, 132 *L.Ed.*2d at 503.]

The Supreme Court observed that "the record [ ] corroborates the expressive nature of GLIB's participation." *Id.* at 570, 115 *S.Ct.* at 2346, 132 *L.Ed.*2d at 502. Specifically, the Supreme Court determined that "GLIB was formed for the very purpose of marching in [the parade] . . . in order to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants, to show that there are such individuals in the community, and to support the like men and women who sought to

march in the New York parade." *Ibid.*, 115 *S.Ct.* at 2346, 132 *L.Ed.*2d at 501.

The Supreme Court also determined that the parade itself is a "form of expression, not just motion." *Id.* at 568, 115 *S.Ct.* at 2345, 132 *L.Ed.*2d at 500. For that reason, the Supreme Court noted that "GLIB understandably seeks to communicate its ideas as part of the existing parade, rather than staging one of its own," *id.* at 570, 115 *S.Ct.* at 2346, 132 *L.Ed.*2d at 501, and that by engaging in that form of expressional activity, GLIB's inclusion was incompatible with or compromised the expressional activities of the parade itself.

Fundamental to the analysis of the Supreme Court, then, was its extrapolation from the record of a basis for concluding that GLIB had sought to engage in expression that was conspicuously and unmistakenly separate from simply serving to identify its members. The Supreme Court's description of that expression as distinct from status was central to its *Hurley* holding.

### 1.

This case does not squarely fall within the paradigm suggested by those authorities defining the contours of the expressive association right because the speech here is so closely intertwined with the identity of the speaker. Thus, as the Court recognizes, while Boy Scouts frames its expulsion of Dale as grounded on an objection to his expression of his homosexuality, that exclusion is tantamount to one based on Dale's status as a homosexual. *Ante* at 624, 734 *A.*2d at 1229; *cf. Able v. United States,* 880 *F.Supp.* 968, 973 (E.D.N.Y.1995) (noting in challenge to constitutionality of military's "don't ask, don't tell" policy that plaintiffs, in stating that they are homosexuals, "have done no more than acknowledge who they are, that is, their status," and that such speech "implicates the First Amendment value of promoting individual dignity and integrity"), *vacated,* 88 *F.*3d 1280 (2d Cir.1996) (vacating primarily on ground of judicial deference to military).[3]

---

[3] The District Court in *Able* further rejected as unconstitutional "a policy that purportedly directs discharge based on 'conduct'" while "defining 'conduct' to

The Court's recognition of the speciousness of drawing a distinction between discrimination grounded in expression versus status in this context, *ante* at 624, 734 *A*.2d at 1230, was previously recognized by Justice Brennan, who observed that sometimes " 'speech' [ ] is better evaluated as no more than a natural consequence of [a person's] sexual orientation." *Rowland v. Mad River Local Sch. Dist.*, 470 *U.S.* 1009, 1017 n. 11, 105 *S.Ct.* 1373, 1379 n. 11, 84 *L.Ed.*2d 392, 397 n. 11 (1985) (Brennan, J., dissenting from denial of cert.). In *Rowland*, the jury found that the petitioner, a schoolteacher, had been dismissed from her job "for no other reason" than "because she was a homosexual who revealed her sexual preference." *Id.* at 1009, 105 *S.Ct.* at 1373, 84 *L.Ed.*2d at 392 (citation omitted). Justice Brennan likened the petitioner's expression of her sexual identity to fellow employees to the generally held knowledge of co-workers about "whom their fellow employees are dating or to whom they are married." *Ibid.* In such instances, wrote Justice Brennan, "it is realistically impossible to separate [ ] spoken statements from [ ] status." *Ibid.*

The confluence of status and expression when both relate to the speaker's sexual orientation is "self-identifying speech." Such expression as "the statement 'I am gay' is illocutionary—like the statements 'J'accuse,' 'I thee wed,' or 'I bet you,' it not only describes, but performs, the action named." Kenji Yoshino, *Assimilationist Bias in Equal Protection: The Visibility Presumption and the Case of "Don't Ask, Don't Tell,"* 108 *Yale L.J.* 485, 550 (1998) (footnote omitted). Self-identifying speech "makes the connection between speech and status," and is illustrated by the ACT UP slogan, "I am out, therefore I am." *Ibid.* (footnotes omitted). Some scholars maintain that the ability to self-identify is critical to being a lesbian or gay man. *See* Brian C. Murchison, *Speech and the Self–Realization Value*, 33 *Harv. C.R.-C.L. L.Rev.* 443, 468 (1998) ("Self-realization [ ] is what speech (including

include statements revealing one's homosexual status" because such policy transmogrifies "a mere acknowledgment of status" into "an admission of misconduct." 880 *F.Supp.* at 975.

expressive activity) makes possible."); Nan D. Hunter, *Identity, Speech, and Equality,* 79 *Va. L.Rev.* 1695, 1718 (1993) ("Self-identifying speech does not merely reflect or communicate one's identity; it is a major factor in constructing identity.").

For purposes of antidiscrimination laws, the relevance of self-identifying speech is not so much in realizing identity, as in its singular role in revealing identity. The importance of self-identifying speech inheres in its legal effect—that is, in the functional capacity of such speech to disclose or clarify the status of a person when that status is entitled to protection against discrimination. A person covered by the LAD has the right to enjoy his or her protected status without suffering discrimination because of who he or she is. If the very means of making those characteristics known—self-identification—can legitimately justify discrimination against that person, then the antidiscrimination protections of the LAD are illusory.

The interdependence of identity and speech is particularly evident where a distinguishing characteristic of identity is not readily apparent, as in the case of sexual orientation. In that regard, there is a clear parallel between status based on sexual orientation and that based on religion. *See* David A.J. Richards, *Sexual Preference as a Suspect (Religious) Classification: An Alternative Perspective on the Unconstitutionality of Anti-Lesbian/Gay Initiatives,* 55 *Ohio St. L.J.* 491 (1994). Unlike characteristics that are obvious upon casual observation, religion and sexual orientation are unknowable unless the person self-identifies.

Courts have recognized that expression and identity can be interdependent in the context of religion. *See Islamic Center v. City of Starkville,* 840 *F.*2d 293, 300 (5th Cir.1988) (noting that expression of religious beliefs "communicates to outsiders the identity of the group and [a person's] own identity as a member of it, a form of self-expression"). Accordingly, the United States Supreme Court has held that in order to adequately insulate religion from state interference, government may not "impose special disabilities on the basis of religious views or religious

status." *Employment Div., Dep't of Human Resources v. Smith,* 494 *U.S.* 872, 877, 110 *S.Ct.* 1595, 1599, 108 *L.Ed.*2d 876, 884 (1990).

The significance of the connection between identity and expression in respect of sexual orientation has been similarly recognized by New Jersey's Legislature in enacting protections for sexual minorities in the LAD. *See ante* at 619–21, 734 *A.*2d at 1227–28. When amending the LAD in 1991 to prohibit discrimination based on "affectional or sexual orientation," the Legislature defined the scope of protection to encompass both concepts:

> "Affectional or sexual orientation" means male or female heterosexuality, homosexuality or bisexuality by inclination, practice, *identity or expression,* having a history thereof or being perceived, presumed or identified by others as having such an orientation.

[*N.J.S.A.* 10:5–5(hh) (emphasis added).]

In so doing, the Legislature affirmed the significant role of self-identifying speech for lesbians and gay men, much in the same way that the Supreme Court has acknowledged that role in respect of religion.

2.

A prime example of self-identifying speech is the language of "coming out," that is, publicly acknowledging one's self as lesbian or gay. Dale's acknowledgment of his homosexuality, therefore, constitutes self-identifying speech, and his exclusion from Boy Scouts cannot be based solely on that expression. As self-identifying speech, "it is realistically impossible to separate [Dale's] spoken statements from [his] status." *Rowland, supra,* 470 *U.S.* at 1017 n. 11, 105 *S.Ct.* at 1379 n. 11, 84 *L.Ed.*2d at 397 n. 11. Thus, as the Court concludes, Dale's expulsion was not based on his expression of views, but on his sexual orientation. *Ante* at 615, 617, 624, 734 *A.*2d at 1225, 1226, 1230.

The Court explains that Dale first acknowledged his own sexual orientation to himself, his family, and his friends while he was a student at Rutgers University. *Id.* at 578, 734 *A.*2d at 1204. Boy Scouts became aware of Dale's sexual orientation only by way of a

newspaper article,[4] *id.* at 578, 734 *A*.2d at 1204–05, which identified Dale as gay:

> James Dale, 19, co-president of the Rutgers University Lesbian/Gay Alliance ... said he lived a double life while in high school, pretending to be straight while attending a military academy.
>
> He remembers dating girls and even laughing at homophobic jokes while at school, only admitting his homosexuality during his second year at Rutgers.
>
> "I was looking for a role model, someone who was gay and accepting of me," Dale said, adding he wasn't just seeking sexual experiences, but a community that would take him in and provide him with a support network and friends.
>
> [Kinga Borondy, *Seminar Addresses Needs of Homosexual Teens, Star–Ledger* (Newark), July 8, 1990, § 2, at 11.]

To treat this public identification as only expression ignores the reality that such speech is inextricably linked to Dale's status as a gay man. As an editorial commenting on the Appellate Division's judgment in this case recognized:

> The Boy Scouts would never have known if James Dale hadn't told them. That has always been the difference about the movement for gay rights. Homosexuals aren't visible. They have to stand up and identify themselves in order to be discriminated against.
>
> [*The Invisible Victory, N.Y. Times,* March 12, 1998, at A26.]

Had Dale expressed more general views on the morality, social implications, history, or etiology of homosexuality in his role as a Boy Scout leader, which directly conflicted with Boy Scouts' stated positions, Boy Scouts could claim that its discrimination was based purely on expression.[5] Dale's statement of his identity, however,

---

[4] The article reported on a conference held at Rutgers University, sponsored by several groups including the National Association of Social Workers–New Jersey Task Force on Lesbian/Gay Issues and Rutgers University School of Social Work, which addressed the unique problems faced by homosexual teenagers struggling to come to terms with their sexual orientation, including an alarmingly high incidence of suicide attempts.

[5] A recent California case, wherein a young man was denied Boy Scouts membership after he stated to a local council's executive director that he wanted to join the Boy Scout program "because he so firmly believed personally in a homosexual lifestyle that there was ... not anything wrong with it, and he wanted to make sure that other kids understood that," illustrates this distinction. *See Curran, supra,* 72 *Cal.Rptr.*2d 410, 952 *P.*2d at 254 (Kennard, J., concurring) (observing that requiring plaintiff's membership would have violated Boy Scouts'

does not express a view about homosexuality generally or specifically advocate that homosexuality is moral. *See Merino, supra,* No. 659236, slip op. at 16 (noting that "acknowledgment of homosexuality does not translate to a 'teaching' that homosexuality is proper or improper any more than a Scout admitting he is Catholic amounts to a 'teaching' that Catholicism is the only proper religion"). As the Court recognizes, "Dale has never used his leadership position or membership to promote homosexuality, or any message inconsistent with Boy Scouts' policies .... [and] there is no indication that Dale intends to actively 'teach' anything whatsoever about homosexuality as a scout leader, or that he will do other than Boy Scouts instructs him to do—refer boys to their parents on matters of religion and sex." *Ante* at 623, 734 *A*.2d at 1229.

### 3.

Because Boy Scouts excluded Dale based on his status as a homosexual, Boy Scouts must demonstrate a "specific expressive purpose" in respect of homosexuality for that exclusion to be permissible. *See supra* at 636–37, 734 *A*.2d at 1236–37. That requirement demands a showing of a clear, particular, and consistent message. *Supra* at 637, 734 *A*.2d at 1223.

Boy Scouts' position in respect of homosexuality cannot be characterized as clear or particular. While Boy Scouts advocates traditional moral values through its Boy Scout program, *ante* at 613, 734 *A*.2d at 1223, it is not at all apparent that this position embraces any view concerning homosexuality. Further, while Boy Scouts professes that the terms "morally straight" and "clean" in the Scout Oath and Law stand for the proposition that homosexuality is immoral, those terms fail to convey any clear or particular message on homosexuality or the precept that homosexuality is immoral. *See ante* at 614, 734 *A*.2d at 1224. This fact is under-

---

right to expressive association). Here, unlike in *Curran,* Dale did not seek membership in order to challenge Boy Scouts' purported views on homosexuality or to project his own views on other scouts.

scored by Dale's testimony, as well as the affidavits of hundreds of other scouts, that they were unaware of any BSA position on the morality of homosexuality.

The inconsistency and vagueness of Boy Scouts' position regarding its members' views on morality generally, and homosexuality in particular, further belies the existence of a "specific expressive purpose" in this regard. *See id.* at 614–15, 734 *A.*2d at 1224–25. Boy Scouts acknowledges that "moral fitness" is an individual choice and defers its ultimate definition to its members:

> Morality ... concerns the "principles of right and wrong" in our behavior, and "what is sanctioned by our conscience or ethical judgment." ... In any consideration of moral fitness, a key word has to be "courage." A boy's courage to do what *his head* and *his heart* tell *him* is right. And the courage to refuse to do what *his heart* and *his head* say is wrong.
>
> [*Scoutmaster Handbook* 71 (1990) (emphasis added).]

Dale appears to have heeded and lived by Boy Scouts' dictate that individual conscience should guide a Scout's moral decision-making. Dale wrote in his affidavit:

> As a Scout, I promised to live by the Scout Oath.... I believed that the Scout Oath stood for my commitment to live an honorable life, *to set standards for myself,* and to do my best to serve others.... As I grew older, my commitment to Scouting deepened.... Scouting ... *taught me how to deal with the ethical choices I encountered* as a teenager.

Boy Scouts' official position on issues of sexuality is that "boys should learn about sex and family life from their parents, consistent with their spiritual beliefs." *Ante* at 576, 734 *A.*2d at 1203. Numerous religious denominations sponsoring Boy Scout units subscribe to the view that homosexuality is compatible with their religious precepts. *Id.* at 575–76, 734 *A.*2d at 1203. Boy Scouts' directive that its members should follow those entities on matters of individual morality, including sexual mores, indicates that tolerance concerning homosexuality is implicit in Boy Scouts' own message on morality. *See id.* at 618, 734 *A.*2d at 1226 (noting that exclusion of members solely on basis of their homosexuality is "antithetical to the organization's goals and philosophy" and "inconsistent with Boy Scouts' commitment to a diverse and 'representative' membership").

Moreover, BSA only charters and approves sponsoring organizations that are " 'compatib[le] with the aims and purposes of [Boy Scouts].' " *Id.* at 572, 734 *A.*2d at 1201. The Court recognizes that the fact that BSA has repeatedly renewed the charters of religious organizations adhering to a view that homosexuality is moral, negates and undermines the alleged consistency of a contrary message. *See id.* at 615, 734 *A.*2d at 1224–25. Additionally, approximately one-fifth of the BSA chartering organizations in New Jersey are public schools and school affiliated groups, and over two hundred Boy Scout units are sponsored by other public entities, such as fire departments and law enforcement agencies. *Ante* at 573, 734 *A.*2d at 1201. The LAD mandates that those entities may not discriminate on the basis of affectional or sexual orientation. *N.J.S.A.* 10:5–4. The continued sponsorship of Boy Scouts units by such public entities is at odds with Boy Scouts' purported view on homosexuality, and thus constitutes further direct evidence of the inconsistency of Boy Scouts' message.

Because Boy Scouts has not established a clear, particular, and consistent message concerning homosexuality, the First Amendment cannot excuse Boy Scouts' status-based discrimination against a member, based solely on his sexual orientation, in violation of the LAD.

### B.

Self-identifying speech that serves only to reveal the status of the speaker is always vulnerable to misinterpretation and misunderstanding based on stereotypes that are associated with the speaker's status. The reliance on such stereotypes to import additional meaning to self-identifying speech is impermissible.

The Court observes that "[t]he United States Supreme Court has not hesitated to uphold the enforcement of a state's antidiscrimination statute against an expressive association claim based on assumptions in respect of status that are not part of the group members' shared expressive purpose." *Ante* at 615, 734 *A.*2d at

1225. The very reason for the distinction between status-based and speech-based exclusion in the Supreme Court's expressive association jurisprudence is that such stereotypical assumptions may not be relied upon to ascertain a person's views. *See supra* at 636, 734 *A.*2d at 1236. In contrast, an organization may rely on expression to justify a speaker's expulsion from membership when that speaker's expression encompasses "ideolog[y] or philosoph[y that is] different from those of [the organization's] existing members." *Roberts, supra,* 468 *U.S.* at 627, 104 *S.Ct.* at 3254, 82 *L. Ed.*2d at 477. When an organization does not ground its decision to exclude on stereotypes, but rather on the expressed views of the speaker, that decision is based on a verifiable measure of whether the speaker's membership would be antithetical to the organization's purposes. *See supra* at 636, 734 *A.*2d at 1236.

In the context in which speech serves to identify the speaker, expression of one's sexual orientation is inseparable from status. *See supra* at 638–41, 734 A.2d at 1237–39. Under that construct, status itself is revealed and realized by speech. It follows that expression that serves only to self-identify cannot be further infused with additional content that is derived from status-driven generalizations or stereotypical assumptions serving as "shorthand measures" of a person's unexpressed views. *See New York State Club Ass'n, supra,* 487 *U.S.* at 13, 108 *S.Ct.* at 2234, 101 *L.Ed.*2d at 16. Stripped of all adverse implications that rest solely on such stereotypes, statements like "I am gay" express nothing more than the sexual orientation of the speaker; no legitimate inference about the speaker's morality can be drawn. Accordingly, a homosexual cannot be said to interfere with the expressive associational rights of Boy Scouts merely because he publicly self-identifies as such.

The same repudiation of status-based stereotypes compelled by the Supreme Court's First Amendment jurisprudence is demanded by the LAD. *See ante* at 618–19, 734 *A.*2d at 1226–27 (observing that "[t]he invocation of stereotypes to justify discrimination is

all too familiar," and that LAD is intended to "eliminate the destructive consequences of discrimination from our society"). The Appellate Division soundly observed that by amending the LAD in 1991 to protect persons from discrimination based on "affectional or sexual orientation," the Legislature "implicit[ly] recogni[zed] that discrimination based on 'archaic' and 'stereotypical notions' about homosexuals that bears no relationship to reality cannot be countenanced." *Ante* at 620, 734 *A*.2d at 1227 (quoting 308 *N.J.Super.* at 549, 706 *A*.2d 270). Accordingly, we emphatically reject the use of stereotypical assumptions about homosexuals as justification for discrimination based on "affectional or sexual orientation." *Id.* at 620–21, 734 *A*.2d at 1227–28.

One particular stereotype that we renounce today is that homosexuals are inherently immoral. That myth is repudiated by decades of social science data that convincingly establish that being homosexual does not, in itself, derogate from one's ability to participate in and contribute responsibly and positively to society. *See* Gregory M. Herek, *Myths About Sexual Orientation: A Lawyer's Guide to Social Science Research* 1 *L. & Sexuality* 133, 134 (1991) (presenting "considerable body of social science data" that counter "longstanding cultural myths and stereotypes that depict lesbians and gay men as immoral, criminal, sick, and drastically different from what most members of society would consider 'normal' "). Like stereotypes about an individual based on sex or race, similar assumptions about a lesbian or gay man are false and unfounded, and reveal nothing about that individual's moral character, or any other aspect of his or her personality:

A homosexual orientation tells nothing reliable about abilities or commitments in work, religion, politics, personal and social relationships, or social activities, except to the extent that in many areas the lives of gay people are frequently conditioned by the attitudes of others.

[*Gay Rights Coalition v. Georgetown Univ.*, 536 *A*.2d 1, 37 (D.C.App.1987) (citations omitted).]

In short, a lesbian or gay person, merely because he or she is a homosexual, is no more or less likely to be moral than a person who is a heterosexual. Accordingly, as the Appellate Division recognized below, there is no reason to view "a gay scoutmaster,

solely because he is a homosexual, [as lacking the] strength of character necessary to properly care for [and] impart BSA humanitarian ideals to the young boys in his charge." 308 *N.J.Super.* at 552, 706 *A.*2d 270. "Plaintiff's exemplary journey through the BSA ranks is testament enough that these stereotypical notions about homosexuals must be rejected." *Ibid.*

The Appellate Division also observed that another particularly pernicious stereotype about homosexuals is implicit in Boy Scouts' arguments: "the sinister and unspoken fear that gay scout leaders will somehow cause physical or emotional injury to scouts." *Id.* at 551, 706 *A.*2d 270. The myth that a homosexual male is more likely than a heterosexual male to molest children has been demolished. *See* Carole Jenny et al., *Are Children at Risk for Sexual Abuse by Homosexuals?,* 94 *Pediatrics* 41 (1994) (concluding that most child abuse appears to be committed by situational child abusers who present themselves as heterosexuals); A. Nicholas Groth & H. Jean Birnbaum, *Adult Sexual Orientation and Attraction to Underage Persons,* 7 *Archives Sexual Behav.* 175, 180–81 (1978) (concluding that "[h]omosexuality and homosexual pedophilia are not synonymous .... [and] that the adult heterosexual male constitutes a greater sexual risk to underage children than does the adult homosexual male"); *see also* Herek, *supra,* 1 *L. & Sexuality* at 152–56 (citing studies and concluding that "[i]t appears from these studies that gay men are no more likely than heterosexual men to molest children"); David Newton, *Homosexual Behavior and Child Molestation: A Review of the Evidence,* 13 *Adolescence* 29 (1978) (surveying data concerning male homosexuality and child molestation and concluding that "there is no reason to believe that anything other than a random connection exists between homosexual behavior and child molestation").

In light of this evidence, the belief that a gay scoutmaster poses a risk to young boys because of his sexual orientation is patently false, and cannot in any way bolster Boy Scouts' First Amendment defense. Accordingly, it must be rejected as an unfounded stereotype. *Accord Doe v. British Universities N.A. Club,* 788 *F.Supp.*

1286, 1292 (D.Conn.1992) (rejecting argument that child molesta-tion was "foreseeable consequence of [ ] sexual orientation," noting that plaintiff "offers not one scintilla of credible evidence to suggest that homosexuals pose a greater risk of committing sexual molestation, assault, or criminal conduct than heterosexuals.... To find otherwise would be to hold that homosexuals are predis-posed towards molesting or sexually assaulting minor males sim-ply by virtue of their sexual orientation. The court cannot and will not adopt such a position absent sufficient evidentiary sup-port.").

The trial court in this case impermissibly invoked stereotypical assumptions about homosexuals to give a specific meaning to "traditional morality," which it then ascribed to Boy Scouts. *Dale v. Boy Scouts of Am.*, No. MON–C–330–92, slip op. at 39–41 (Ch. Div. Nov. 3, 1995). The court, equating homosexuality with sodomy, expressed the view that because at the founding of Boy Scouts in 1910, "sodomy was a serious criminal offense in every state in the Union, ... [t]o suggest that Boy Scouts had no policy against active homosexuality is nonsense." [6] *Id.* at 39–40. The court reasoned that sodomy laws were expressive of societal moral values, and from that concluded that Boy Scouts adopted and continues to adhere to those mores today.

Sodomy laws, as applied against homosexuals, reflect the same stereotypical thinking that we now recognize as invidious, includ-ing untenable assumptions about the morality of homosexuals, that have long been superseded and overcome. In successfully defend-ing the constitutionality of its sodomy statute, for example, the State of Georgia relied on the stereotypes of homosexuals as immoral people and child molesters. *See Bowers v. Hardwick*, 478 *U.S.* 186, 195, 106 *S.Ct.* 2841, 2847, 92 *L.Ed.*2d 140, 149 (1986); Lynne N. Henderson, *Legality and Empathy*, 85 *Mich. L.Rev.*

---

[6] In addition to the court's reliance on stereotypes, its failure to differentiate between Dale's status as a homosexual and homosexual conduct was manifestly in error. *E.g.*, Janet E. Halley, *Reasoning About Sodomy: Act and Identity In and After Bowers v. Hardwick*, 79 *Va. L.Rev.* 1721, 1736 (1993).

1574, 1641–49 (1987) (discussing arguments of Georgia Attorney General in *Bowers* ). That same sodomy statute was later struck down as unconstitutional under the Georgia State Constitution. *Powell v. State,* 270 *Ga.* 327, 510 *S.E.*2d 18 (1998). The 1979 repudiation of New Jersey's sodomy statutes, *N.J.S.A.* 2A:143–1, –2, is further evidence of the evolution in social thinking about homosexuality.

Sodomy laws and their implicit moral assumptions about homosexuals very much parallel miscegenation statutes, which were grounded in similar stereotypical notions concerning the morality of African Americans. *See Bowers, supra,* 478 *U.S.* at 210 n. 5, 106 *S.Ct.* at 2854 n. 5, 92 *L.Ed.*2d at 158 n. 5 (Blackmun, J., dissenting) (noting that parallel between miscegenation and sodomy laws "is almost uncanny"); *id.* at 216 n. 9, 106 *S.Ct.* at 2857 n. 9, 92 *L.Ed.*2d at 162 n. 9 (Stevens, J., dissenting) (observing that "miscegenation was once treated as a crime similar to sodomy"). Miscegenation laws, which existed in many states at Boy Scouts' founding in 1910, were grounded in antiquated notions of race and morality and were considered valid "measures designed to maintain White Supremacy"[7] until declared unconstitutional by the United States Supreme Court. *Loving v. Virginia,* 388 *U.S.* 1, 11–12, 87 *S.Ct.* 1817, 1823–24, 18 *L.Ed.*2d 1010, 1017–18 (1966). The indefensibility of basing contemporary moral views regarding race on those laws is obvious. The same is true of placing current reliance on the archaic moral views underlying sodomy laws, which are totally inconsistent with present day conceptions of homosexuality.

---

[7] The trial court in *Loving,* for example, cited the following justification for Virginia's miscegenation statute:

> "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix." [*Id.* at 3, 87 *S.Ct.* at 1819, 18 *L.Ed.*2d. at 1013.]

It is not tenable to conclude that because at one time "traditional moral values" were based on unsupportable stereotypes about homosexuals, those values have survived and endured unchanged in contemporary times. It is similarly untenable to conclude, in the absence of a clear, particular, and consistent message to the contrary, that Boy Scouts—a federally chartered and nationally recognized organization with significant ties to governmental institutions and public entities that fully adhere to contemporary laws rejecting anachronistic stereotypes about homosexuality—remains entrenched in the social mores that existed at the time of its inception.

Stereotypes cannot be invoked to extend the meaning of self-identifying expression of one's own sexual orientation, and thereby become a vehicle for discrimination against homosexuals. Such stereotypes, baseless assumptions, and unsupported generalizations reflecting a discredited view of homosexuality as criminal, immoral and improper are discordant with current law and public policy. Accordingly, they cannot serve to define contemporary social mores and morality. Boy Scouts' adherence to "traditional moral values," its "belief in moral values," and its uncontroverted purpose to "encourage the moral development of its members," *ante* at 613, 734 *A.*2d at 1223, remain undisturbed and undeterred by Dale's open avowal of his homosexuality.

### III

For the foregoing reasons, I concur in the opinion of the Court.

HANDLER, J., concurs in the result.

*For affirmance and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.